KING ET AL. *v.* WAIGAND ET AL.

[No. 27, October Term, 1955.]

 

*Decided November 14, 1955.*

*Motion for rehearing filed December 9, 1955, denied January 3, 1956.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Michael Leo Looney,* with whom were *Duley & De Blasis* and *Oscar R. Duley* on the brief, for appellants.

*Edward B. Dunford,* with whom was *Waldo Burnside* on the brief, for appellees.

DELAPLAINE, J., delivered the opinion of the Court.

William King and Rose King, his wife, have been operating a store on the Baltimore-Washington Boulevard at the corner of Baltimore Avenue and Queensbury Road in Riverdale. The store is located in the subdivision of Riverdale Park. From 1949 to 1954 the Kings were licensed by the Board of License Commissioners of Prince George's County to sell beer and wine. On September 6, 1954, the Board issued them a Class A (off sale) beer, wine and liquor license. Suit was thereupon entered in the Circuit Court for Prince George's County by Fred-

erick W. Waigand and other property owners in River-
dale Park to enjoin the Kings and also Charles C. Glover,
Jr., of Washington, owner of the realty, from selling
and allowing the sale of spirituous liquors on the
premises.

The bill of complaint alleged that in 1890 the River-
dale Park Company, a New York corporation, filed in
the land records a plat establishing the subdivision of
Riverdale Park; and that, as a part of its general plan
for the development of the subdivision as a residential
community, the company included in its deeds to the
purchasers of lots certain restrictive covenants run-
ning with the land. The bill further alleged that the
deeds by which complainants acquired title to their lots
recite that the conveyances were made subject to the
covenants, among which is the restriction against the
sale of "spirituous or malt liquors"; that spirituous
liquors have never been legally sold in Riverdale Park,
which is still a residential area; and that the restric-
tion against the sale of spirituous liquors has never been
waived.

Defendants, in their answer to the bill, asserted that
they have been selling malt liquors and wine in their
store for several years; that there are other establish-
ments in the subdivision which have been selling malt
liquors and wine for a number of years; and that the
right to enforce the covenant has been waived and
therefore complainants are estopped from enforcing it.

The covenant in controversy reads as follows:

"That no blacksmith or other shop, no manu-
factory of any kind, no livery stables, pig pen,
or bone boiling or similar establishment shall
be erected or permitted on said lots. That no
spirituous or malt liquors shall be made, sold
or kept for sale upon said premises; that no
nuisance or offensive, noisy or illegal trade,
calling or transaction shall be done, suffered
or permitted thereon, and that no part of said

premises shall be so used or occupied as to in juriously affect the use, occupation or value of the adjoining or adjacent premises for residence purposes, or the neighborhood wherein said premises are situated. * * * And any breach or threatened breach of this covenant may be enjoined upon the application of said grantor, their successors or assigns (assigns shall include any person deriving title to any lot in said Riverdale Park from the grantors), and said grantors, and their successors shall also have the right to recover the sum of $1,000.00 as liquidated damages for every breach. These covenants are to be taken and construed as running with the land."

The chancellor held that the restriction against "spirituous or malt liquors" is severable, and that an abandonment of the restriction against malt liquors does not necessarily mean an abandonment of the restriction against spirituous liquors. He accordingly entered a decree enjoining defendants from selling and allowing the sale of spirituous liquors on the premises. The Kings appealed from that decree.

The obvious purpose of the covenant was to prevent any establishments or activities that might detract from the subdivision as a residential area. There is, of course, no question of the doctrine that where the owner of land enters into a covenant concerning its use, subjecting it to an easement or personal servitude, and the land is afterwards conveyed to one who has notice of the covenant, the grantee will take the land bound by the covenant and will be compelled in equity to specifically execute it or will be restrained from violating it; and it makes no difference, with respect to this liability in equity, whether or not the covenant is one which runs with the land. *Newbold v. Peabody Heights Co.*, 70 Md. 493, 17 A. 372, 3 L. R. A. 579; *Peabody Heights Co. of Baltimore City v. Willson*, 82 Md. 186, 32 A. 386, 1077,

36 L. R. A. 393; *Clem v. Valentine,* 155 Md. 19, 141 A. 710; *Turner v. Brocato,* 206 Md. 336, 111 A. 2d 855, 860; *Coomes v. Aero Theatre and Shopping Center,* 207 Md. 432, 437, 438, 114 A. 2d 631, 635; 2 *Pomeroy, Equity Jurisprudence,* 5th Ed., sec. 689.

Defendants asserted, however, that the particular restriction now in controversy, which was imposed 65 years ago in the horse and buggy days, has been rendered unenforceable by the change in the character of the neighborhood. Mayor Claude Warren of Riverdale testified that when he located in Riverdale in 1905, the Baltimore-Washington Boulevard was a dirt road and there were no buildings on either side of the road except one house, and that was some distance back from the road. There was only one grocery store in that rural area. There were not more than 50 houses in the entire subdivision. Between 1905 and 1913, according to the testimony, many homes were built in Riverdale Park and the area was almost entirely residential until 1920.

In 1920 the town of Riverdale was incorporated, and Riverdale Park was embraced within the corporate limits. Laws 1920, ch. 731. Various places of business then sprang up along this section of the Baltimore-Washington Boulevard. Adjoining defendants' store is a tavern that sells beer and wine. On the same side of the road are the post office, a hardware store, a cleaning establishment, an animal hospital, a market, and a fence company. On the other side of the road are three gasoline filling stations, a bank, a barber shop, a liquor store, and other establishments. On Queensbury Road is an electronics laboratory. Also in the Riverdale Park subdivision are a bottling factory, a refrigerator sales place, a shade shop, and a screen company. Defendants asserted that the passage of time and the changing panorama have substituted the automobile for the horse and buggy, thus eliminating any possibility of the residential character of the subdivision being invaded by livery stables or blacksmith shops, and that the homes, stores, taverns,

and filling stations have left little room for pig pens and bone boiling plants.

It is important to keep in mind, however, that the covenant does not prohibit all commercial enterprises. It prohibits only those specifically mentioned. There was no restriction, for example, against grocery stores. Evidently the officers of the development company realized that stores would be needed in the development. In fact, as we have indicated, there was a grocery store in the area over a half century ago. The filling stations, restaurants, and other commercial enterprises, which have been established in the subdivision, do not violate the covenant. These useful enterprises do not have the effect of waiving the restriction against the sale of spirituous liquors. It is admitted that no license has ever been issued before for the sale of spirituous liquors in Riverdale Park.

Defendants insisted, however, that although no license has ever before been issued for the sale of spirituous liquors, five places have been licensed to sell beer and wine in Riverdale Park. Defendants contended that the restriction against the sale of "spirituous or malt liquors" is not severable into two restrictions, one against spirituous liquors and one against malt liquors; and therefore the restriction against both spirituous and malt liquors has been waived by the acquiescence of property owners in the sale of beer and wine. We cannot accept that contention. This restriction is in the disjunctive. The distinction between "spirituous liquors" and "malt liquors" is perfectly clear and commonly known. We hold that the restriction is severable. "Spirituous liquors" and "malt liquors" are not synonymous terms. Spirituous liquors are those, like whiskey, rum, and gin, which contain alcohol extracted by distillation. Malt liquors are those produced by fermentation of malt. *State v. Adams,* 51 N. H. 568; *Sarlls v. United States,* 152 U. S. 570, 14 S. Ct. 720, 38 L. Ed. 556; *Jameson v. Brown,* 71 App. D. C. 254, 109 F. 2d 830.

The history of the sale of intoxicating liquors in the Riverdale area supports the ruling that the restriction against "spirituous or malt liquors" is severable. We find that as far back as the year 1914 an application was made for a license to sell spirituous liquors in a country club in Riverdale Park, but the plan was opposed by property owners in the neighborhood, and the Circuit Court permanently enjoined the applicants from violating the restrictive covenant.

In 1916 the Legislature made it unlawful to sell "any spirituous or fermented liquors" within the limits of Riverdale Election District, which embraced Riverdale Park. Laws 1916, ch. 317.

In June, 1917, the Legislature passed an "emergency war measure" prohibiting the sale of intoxicating liquors within the limits of Prince George's County. Laws 1917, Extra Sess., ch. 13. The Act defined "spirituous liquors" as all vinous or spirituous liquors, including whiskey, brandy, and other intoxicating drinks other than malt or brewed drinks; and "malt liquors" as porter, ale, beer, and all malt or brewed drinks, whether intoxicating or not, containing as much as one-half of one per cent of alcohol by volume.

National Prohibition was in force from January, 1920, until December, 1933, when the Eighteenth Amendment was repealed by the Twenty-first Amendment.

In 1933 the Legislature repealed the Prince George's County Prohibition Act of 1917 and passed an Act for the regulation and sale of malt liquors containing not more than 3.2 per cent of alcohol. Laws 1933, ch. 488.

The State Alcoholic Beverages Act went into effect upon its approval by Governor Ritchie on December 5, 1933. Laws 1933, Extra Sess., ch. 2. This Act authorizes the issuance of beer licenses, beer and light wine licenses, and beer, wine and liquor licenses. The Act now provides that it shall be unlawful for any person to sell within the corporate limits of the town of Riverdale any alcoholic beverages or intoxicating drinks for

consumption on the premises, except beer and wine. Code 1951, art. 2B, sec. 36.

In 1937 the Mayor and Common Council of Riverdale petitioned the Legislature to pass a local option law allowing the voters of the town to vote on whether all alcoholic beverages could be sold within the corporate limits. The Legislature passed an Act, subject to referendum, making it unlawful to sell any alcoholic beverages other than wine and beer for consumption on the premises. Laws 1937, ch. 544. The vote was overwhelmingly in favor of the Act.

Finally, defendants urged that when the town of Riverdale was incorporated, Riverdale Park was embraced within the corporate limits, and spirituous liquors have been sold within these limits for many years. They called particular attention to the fact that just across the road from defendants' store there is a store selling whiskey, gin, rum, and other beverages for consumption off the premises. However, that store is not in the Riverdale Park subdivision and is not subject to the covenant. It is obvious that the proximity of liquor stores in other subdivisions does not render the covenant in this subdivision unenforceable.

For the reasons we have stated, the decree of the chancellor granting the injunction must be affirmed.

*Decree affirmed, with costs.*