Scott Shader, et ux. v. Hampton Improvement Ass'n, Inc., No. 75, Sept. Term 2014, Opinion by Battaglia, J.

**CIVIL PROCEDURE – OFFENSIVE NON-MUTUAL COLLATERAL ESTOPPEL**

The Court of Appeals again declined to adopt the doctrine of offensive non-mutual collateral estoppel, which may be invoked when a plaintiff attempts to foreclose a defendant from relitigating an issue that was decided in a prior case in which the defendant, but not the plaintiff, was a party.

**REAL PROPERTY – COVENANTS – ABANDONMENT**

Covenant restricting the construction of a second dwelling on a lot subject to the original 1930 Plat was not abandoned by the construction of additional buildings that were not dwellings on properties subject to covenant.

**REAL PROPERTY – COVENANTS – ABANDONMENT – SEVERANCE**

A single clause in a series of restrictive covenants, which is the subject of a waiver by abandonment, may be severed from the remainder of the covenants and does not make the remaining covenants unenforceable.

Circuit Court for Baltimore County,
Maryland
Case No. 03-C-12-011284
Argued: April 8, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 75

September Term, 2014

SCOTT SHADER, ET UX.

v.

HAMPTON IMPROVEMENT
ASSOCIATION, INC.

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

Opinion by Battaglia, J.

Filed: May 27, 2015

The attempt to enforce restrictive covenants in a community of 635 single family homes in Hampton, a residential neighborhood in Baltimore County, is at issue before us.[1] The restrictive covenants attempt to prohibit the development of more than one single family dwelling per lot.

In 2002, Anna and Scott Shader, Petitioners, purchased real property at 606 East Seminary Avenue in Hampton.[2] The property is composed of Lot 59, a 2.246-acre parcel, and a portion of Lot 75, a 1.457-acre parcel to the north of Lot 59 as depicted on the original

---

[1] We granted certiorari to consider the following questions, which we have renumbered as follows:

> [1]. Whether the lower courts properly held that the Hampton Improvement Association, Inc. was not estopped from claiming that the covenant in question was still valid in light of a prior ruling by Judge Cahill that the covenant had been waived by abandonment, which ruling was not appealed.
> [2]. Whether the Circuit Court abused its discretion in not granting pre-trial summary judgment, where collateral estoppel should have prevented the Defendant from re-litigating facts which had been found against it in an unappealed prior action?
> [3]. Whether the lower courts properly held that the covenant at issue had not been waived or abandoned.
> [4]. Whether beneficiaries of covenants can permit multiple violations of one part of the covenants and still seek enforcement of other parts of the same covenants.

440 Md. 225, 101 A.3d 1063 (2014).

[2] The Hampton Mansion and estate comprise a National Historic Site in Baltimore County, Maryland. In 1745, Colonel Charles Ridgely, a plantation owner, planter and merchant, purchased a 1500 acre tract of land known as "Northampton" for 600 pounds sterling, in addition to other acquisitions such as "Oakhampton and "Hampton Court". Lynne Dakin Hastings, *A Guidebook to Hampton National Historic Site* 19 (Margaret Worrall ed., 1986). Colonel Ridgley's younger son, Captain Ridgely, built the Hampton Mansion on the property in the late 1700s. *Id.* In 1929, John Ridgely, Jr., a descendant of Colonel Charles Ridgely, established the Hampton Development Company (hereinafter "Hampton Company") and began developing residences on the Hampton property. *Id.*

1930 Plat recorded by the Hampton Company. In 2004, the Shaders purported to subdivide their property to create an additional undeveloped parcel with a new address: 606A East Seminary Avenue. Within five years, the Shaders offered 606A for sale through real estate agents, who listed the "new" acreage as separate and buildable.

The Hampton Improvement Association (hereinafter "HIA"), Respondent, thereafter, contacted the Shaders's real estate agents by letter and noted that Paragraph C, in the Schedule of Restrictive Covenants and Easements recorded by the Hampton Company in 1931, "specifically prohibited" property owners from the "[e]rection of more than one house per deeded lot, as shown on the original [1930] Plat Map at the time the property was recorded". (emphasis in original). Paragraph C provides:

> The land included in said tract except as hereinafter provided shall be used for private residence purposes only and no building of any kind whatsoever shall be erected or maintained thereon except private dwelling houses each dwelling being designed for occupation by a single family and private garages for the sole use of the respective owners or occupants of the plots upon which such garages are erected there shall not be erected or maintained on said tract of land an apartment house or house designed or altered for occupation by more than one family and no more than one dwelling may be erected on a lot.

In late 2012, the Shaders filed a complaint for declaratory relief in the Circuit Court for Baltimore County against the HIA seeking a declaration that their property consisted of two separate buildable lots and that the restrictive covenants did not prohibit the building of a home on the second lot.[3] In their complaint, the Shaders recited both the history of the restrictive covenants in the Hampton community and of their specific property:

---

[3] The second lot is referred to as 606A East Seminary Avenue.

2

3. Hampton was originally formed in 1930 via the recordation of a Plat by the Hampton Company, dated July 16, 1930, [(hereinafter "1930 Plat")] which plat is recorded among the Land Records of Baltimore County in Plat Book 9 folio 109 . . . .

4. On April 6, 1931, The Hampton Company recorded a Schedule of Restrictive Covenants and Easements ("Covenants") which Covenants were recorded among the Land Records of Baltimore County in Liber 866, folio 475-478 . . . .

5. Among the restrictions in the Covenants, was Paragraph C, found at Liber 866, folio 476. That covenant read as follows:

> The land included in said tract except as hereinafter provided shall be used for private residence purposes only and no building of any kind whatsoever shall be erected or maintained thereon except private dwelling houses each dwelling being designed for occupation by a single family and private garages for the sole use of the respective owners or occupants of the plots upon which such garages are erected there shall not be erected or maintained on said tract of land an apartment house or house designed or altered for occupation by more than one family and no more than one dwelling may be erected on a lot.[4]

6. The word "Lot" was defined at Liber 866, folio 475 as "one unit of said tract as at present shown by the recorded map of said tract. ("Tract" or "Tract of Land" was defined on the same page as the Plat No. 1 of Hampton.)

7. On February 10, 1939, a Revised Plat of Lots 40, 42 and 44 to 54, inclusive was filed among the Land Records of Baltimore County in Plat Book 12, folio 38 . . . .

\*\*\*

10. When the Shaders purchased the Property, it consisted of two parcels, to wit; Lot 59 and the easterly portion of Lot 75, as shown on Plat No. 1 of Hampton . . . .

11. On September 10, 2004, the Shaders reconfigured the two parcels and recorded deeds to that effect . . . .

---

[4] The duration of Paragraph C, among the other provisions within the Schedule of Restrictive Covenants and Easements, was laid out in Paragraph H, which stated that:

> All of the restrictions conditions covenants easements and agreements contained here in shall be in perpetuity provided however that at any time after December 31 1960 any of the provisions contained in Paragraphs C D and K hereof may be cancelled or abrogated in whole or in part by the recording in the proper public Land Records of an appropriate instrument or instruments in writing executed by the then owners (not including mortgagees) of a majority in area of the land included in said tract exclusive of streets and other land then devoted to public use . . . .

3

12. The Shaders have a home on the lot known as 606 E. Seminary Avenue and wish to either build a house on Lot 606A East Seminary Avenue or sell 606A East Seminary Avenue as a buildable lot.

13. The HIA has communicated to the Shaders that the Covenants prevent them or their successors in title from building 606A East Seminary Avenue . . . .

The Shaders alleged, specifically, that Paragraph C had been abandoned by the HIA due to numerous violations of Paragraph C that occurred in the other lots in Hampton:

14. Over the years, numerous homes have been built in Hampton which violate the Covenants in numerous ways. For example:
   a) There are several instances where due to lot re-configurations (similar to the Shader lot re-configuration) homes have been built such that there are more than one home on a given Lot as Lot was defined in the 1930 Plat.
   b) There are numerous Lots on which buildings other than single family dwellings and private garages have been constructed and maintained.

The HIA timely filed an answer, not only denying the Shaders's allegations, but also affirmatively defending that the Shaders's claims were barred by laches and the statute of limitations.

The Shaders, thereafter, moved for summary judgment, arguing that they were entitled to judgment as a matter of law as a result of a prior judgment entered against the HIA in *Cortezi, et al. v. Duval Four-A, LLC,* No. C-07-002587 (Cir. Ct. Balt. Cnty. 2008) ("*Duval*"), in which, they alleged, Paragraph C was not enforced:

2. The issue in this case (whether the covenants found at Liber 866, folio 475-478 are still enforceable or whether they have been abandoned) has already been decided as a matter of fact by this Court in a prior case (*Cortezi, et al. v. Duval-Four, LLC*, Case No. C-07-002587).
3. Hampton Improvement Association, Inc. was a party plaintiff in *Cortezi*.
4. The findings of this Court in the *Cortezi* case were not appealed.

4

The HIA filed its own motion for summary judgment[5] and opposed the Shaders's summary judgment motion, alleging that they could not avail themselves of the *Duval* judgment because offensive non-mutual collateral estoppel[6] had not been recognized in Maryland, as well as that genuine issues of material fact existed regarding whether the HIA had actually waived Paragraph C. Judge John F. Fader II, retired from the Circuit Court of Baltimore County, sitting as a motions judge, denied both motions for summary judgment:

> First, I do not feel that "collateral estoppel" is able to be applied here. . . . [This doctrine] require[s] the placing of one face plate over another to see if the issues are the same and if the parties are fundamentally the same so as to be bound by a prior decision. There is nothing in the Shader motion that would allow me to see the face plate of the actual controversy before [the *Duval* court] and the decision by [the *Duval* court] as to the structures or buildings to which it refers as a violation of what covenant or issue presented. Second, the Response . . . makes an important distinction between the erection of houses as opposed to other sheds or buildings, the fact that there is argued not to have been an abandonment of covenants for Plat # 1, differences that may exist between the covenants, and application of the covenants as to different plats. That all means that a significant amount of additional facts needs to be gone through by the court before summary judgment or any judgment would be able to be entered.

A non-jury trial was held before Judge Kathleen G. Cox of the Circuit Court for Baltimore County, at which time the parties renewed their motions for summary judgment.[7]

---

[5] The HIA moved for summary judgment arguing that the Shaders had failed to file their complaint within the applicable three year statute of limitations after becoming aware of the dispute.

[6] The doctrine of offensive non-mutual collateral estoppel may be applied "when a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against a different party." *Welsh v. Gerber Products, Inc.*, 315 Md. 510, 517 n.6, 555 A.2d 486, 489 n.6 (1989).

[7] The court reserved its ruling until after the close of evidence, and ultimately the court held the matter *sub curiae.*

In a memorandum opinion, Judge Cox also denied both motions for summary judgment

and ultimately denied the Shaders's request for declaratory relief. The court, first, denied

the HIA's motion for summary judgment:

> The Court does not believe that the claim is barred by limitations simply because the Shaders received a letter that placed them on notice of [the] Covenants. The Shaders' claim did not ripen until they intended or sought to take action that was arguably barred by the Covenants. The Covenants arguably constitute a continuing restriction on the use of the property. In the context of the present dispute, one basis for the Shaders' claim for relief is that the HIA has abandoned the right to enforce the Covenants, based upon other neighborhood development. Thus the status of enforceability, to some extent, remains in a state of flux. The Shaders filed for declaratory relief concerning the continued viability of the Covenant governing construction of a second residence. Given this declaratory posture, the claim is not time barred. Accordingly, the HIA's Motion for Summary Judgment is denied.

(citation omitted).

Judge Cox then turned to the Shaders's collateral estoppel argument in their motion

for summary judgment and recognized that it required an application of offensive non-

mutual collateral estoppel, but determined that the *Duval* case dealt with different and

distinct issues than the instant case:

> The Shaders' argument requires application of the doctrine of non-mutual offensive collateral estoppel to the Duval ruling. Non-mutual offensive collateral estoppel requires four determinations:
>     1. Was the issue decided in the prior adjudication identical with the one presented in the action in question?
>     2. Was there a final judgment on the merits?
>     3. Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?
>     4. Was the party against whom the plea is asserted given a fair opportunity to be heard on the issue?
> Leeds Fed. Sav. & Loan Ass'n v. Metcalf, 332 Md. 107, 117-18, 630 A.2d 245, 250 (1993).

In the present case, the issues decided in the prior Duval matter are not identical to the issue presented in this case. While the issues are clearly related, the Shaders' property consists of one "original" lot and a portion of another lot that were joined in one parcel. The Shaders then sought to re-configure the lot line between these two parcels . . . .

After denying the Shaders's summary judgment, Judge Cox acknowledged the separation of clauses in Paragraph C, and distinguished between the restriction of "no building of any kind whatsoever shall be erected or maintained thereon except private dwelling houses" and the clause that requires "no more than one dwelling may be erected on a Lot". Judge Cox rejected the Shaders's argument that the HIA had failed to enforce the clause restricting "no more than one dwelling may be erected on a Lot" due to the construction of separate structures, such as pool houses, gazebos, guest houses and sheds, on the other lots, noting:

> Although the Shaders were able to show numerous instances of violations based upon construction of separate structures on properties throughout the community, they were unable to demonstrate construction of a second residence on a single lot. Rather, the evidence demonstrates that the HIA has consistently taken action to enforce the restriction in the Covenants that requires 'no more than one dwelling may be erected on a Lot.'

Judge Cox opined that "restrictive Covenants may be abandoned in part without resulting in a wholesale abandonment of all restrictive Covenants", and although there were additional non-residential buildings constructed on single lots in violation of one clause in Paragraph C, such construction did not invalidate the restriction on the construction of separate dwellings on a single lot.

Judge Cox also addressed the Shaders's argument that they owned two separate lots and, therefore, would not be in violation of the restriction prohibiting the construction of a

second dwelling on a single lot were they to construct a dwelling on 606A East Seminary. She rejected this argument, and concluded that the term "lot" in Paragraph C was intended by the grantors to refer to the "Lots as displayed on the initial plat from 1930":

> The deed in the chain of title to Lot 75 states clearly that it is not a buildable lot. Lot 75, as indicated on the 1930 plat, already contains a residential dwelling. The proposal to build another residence on lots that have been reconfigured, but nevertheless already each support a residence, would violate the Covenants.

The Shaders noted an appeal.

In a reported opinion, the Court of Special Appeals affirmed. *Shader v. Hampton Imp. Ass'n, Inc.*, 217 Md. App. 581, 94 A.3d 224 (2014). Our intermediate appellate court determined that the Circuit Court correctly denied the Shaders's attempted use of offensive non-mutual collateral estoppel, because the issues in *Duval* were not identical to the issues in the instant case. The Court of Special Appeals noted that the issues were distinct, because "the *Duval* case involved a lot—Lot 4–A—that was created more than 50 years prior by the Hampton Company as shown on the 1949 Plat", whereas the Shaders's lot consists of one lot from the original 1930 Plat and a portion of another lot that was joined in a single parcel. *Id.* at 606, 94 A.3d at 238. With respect to the issue of waiver by abandonment, the Court of Special Appeals determined that the Circuit Court was not clearly erroneous in finding that the restriction prohibiting the construction of more than one dwelling on a single lot was not abandoned. The Court of Special Appeals also agreed with Judge Cox that "restrictions in a set of covenants may be severable" and thus, although the clause restricting the erection of additional non-residential buildings had been waived by the construction of additional buildings, such as pool houses, gazebos, guest houses and sheds,

8

the balance of Paragraph C, including the restriction on the construction of more than one dwelling, was not abandoned by the HIA and was, therefore, enforceable. *Id.* at 624, 94 A.3d at 249.

We granted certiorari. 440 Md. 225, 101 A.3d 1063 (2014). Before us, the Shaders rely on substantially the same arguments as were presented before the Court of Special Appeals, as does the HIA.

We shall hold that the Circuit Court did not err in denying the Shaders's motion for summary judgment because we have not adopted the doctrine of offensive non-mutual collateral estoppel and decline to do so in the present case, because the instant issues are not identical to those in *Duval*. We shall hold that the Circuit Court did not err in determining that the HIA did not waive by abandonment the clause restricting the construction of more than one residential dwelling per lot in Paragraph C of the recorded Schedule of Restrictive Covenants and Easements. We shall also hold that the HIA's waiver of the clause restricting the construction of a building aside from a residential dwelling on a single lot may be severed from the remainder of the covenants and does not make the remaining covenants in Paragraph C unenforceable.

## DISCUSSION

### I. Collateral Estoppel

We initially address the Shaders's claim that the HIA is barred from relitigating the enforcement of Paragraph C because the issue was decided in the *Duval* ruling.

When the doctrine of collateral estoppel is applied, "factual issues resolved in the adjudication of one claim are binding for purposes of subsequent adjudication of another

9

claim."[8] John A. Lynch, Jr. & Richard W. Bourne, *Modern Maryland Civil Procedure* 12-42-43 (2d ed. 2004, 2014 Supp.). "The determination of ultimate fact underlying the judgment in a previous proceeding is the gravamen of the doctrine." *Standard Fire Ins. Co. v. Berrett*, 395 Md. 439, 457, 910 A.2d 1072, 1083 (2006). The purpose of the doctrine, like *res judicata*, is "to avoid the expense and vexation of multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibilities of inconsistent decisions." *Rourke v. Amchem Products, Inc.*, 384 Md. 329, 359, 863 A.2d 926, 944 (2004), quoting *Murray Int'l Freight Corp. v. Graham*, 315 Md. 543, 547, 555 A.2d 502, 504 (1989).

In its traditional form, collateral estoppel may be invoked when "in a second suit *between the same parties*, even if the cause of action is different, any determination of fact that was actually litigated and was essential to a valid and final judgment is conclusive." *Id.* at 340-41, 863 A.2d at 933 (emphasis in original). A four-part test is used, generally, to determine whether the doctrine of collateral estoppel applies:

> 1. Was the issue decided in the prior adjudication identical with the one presented in the action in question?
> 2. Was there a final judgment on the merits?
> 3. Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?
> 4. Was the party against whom the plea is asserted given a fair opportunity to be heard on the issue?

---

[8] "Collateral estoppel is concerned with the issue implications of the earlier litigation of a different case". *Colandrea v. Wilde Lake Cmty. Ass'n, Inc.*, 361 Md. 371, 390-91, 761 A.2d 899, 909 (2000).

*Burruss v. Bd. of Cnty. Comm'rs of Frederick Cnty.*, 427 Md. 231, 249-50, 46 A.3d 1182, 1193 (2012), quoting *Wash. Suburban Sanitary Comm'n v. TKU Assocs.*, 281 Md. 1, 18–19, 376 A.2d 505, 514 (1977). "[F]or the doctrine of collateral estoppel to apply, the probable fact-finding that undergirds the judgment used to estop must be scrutinized to determine if the issues raised in that proceeding were actually litigated, or facts necessary to resolve the pertinent issues were adjudicated in that action." *Colandrea v. Wilde Lake Cmty. Ass'n, Inc.*, 361 Md. 371, 391-92, 761 A.2d 899, 910 (2000), citing *Burkett v. State*, 98 Md. App. 459, 466, 633 A.2d 902, 906 (1993).

The traditional principle of mutuality of parties as an element of collateral estoppel has not always been required "if one of the parties in the original case is involved in relitigating one of the issues determined against a different party in a successive suit." *Berrett*, 395 Md. at 457, 910 A.2d at 1083. Considered "non-mutual" collateral estoppel, it has been used both defensively, as well as offensively. *See Burruss*, 427 Md. at 249-50, 46 A.3d at 1193; *Berrett*, 395 Md. at 458, 910 A.2d at 1083; *Rourke*, 384 Md. at 341, 863 A.2d at 933. *Defensive* non-mutual collateral estoppel has been invoked in Maryland, "when a defendant seeks to prevent a plaintiff from relitigating an issue the plaintiff has previously litigated unsuccessfully in another action against a different party." *Welsh v. Gerber Products, Inc.*, 315 Md. 510, 517 n.6, 555 A.2d 486, 489 n.6 (1989).

The doctrine of *offensive* non-mutual collateral estoppel has not been embraced and applied by this Court, but has been invoked by other courts "when a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against a different party". *Id.* In *Burruss v. Board of*

11

*County Commissioners of Frederick County*, 427 Md. 231, 46 A.3d 1182 (2012), we

declined to adopt the doctrine of offensive non-mutual collateral estoppel in a situation in

which the Board of County Commissioners of Frederick County appointed a nine-member

charter board to draft and present a charter to Frederick voters pursuant to Section 1A of

Article XI–A of the Maryland Constitution.[9] Ellis C. Burruss and other individuals who

---

[9] Section 1A of Article XI–A of the Maryland Constitution provides:

> The procedure provided in this section for adoption of a charter may be used in any county in lieu of the procedures provided in Section 1 of this Article, and a charter adopted pursuant to this section has the effect of a charter adopted in accordance with the provisions of Section 1. The board of county commissioners of any county at any time may appoint a charter board. Said charter board shall be registered voters and shall consist of an uneven number of members, not fewer than five or more than nine. The board of county commissioners shall appoint a charter board within thirty days after receiving a petition signed by five percent of the registered voters of the county or by ten thousand voters of the county, whichever is the lesser number. If additional charter board members are nominated by petitions signed by three percent of the registered voters of the county or by two thousand registered voters, whichever is the lesser number, delivered to the board of county commissioners within sixty days after the charter board is appointed, the board of county commissioners shall call a special election not less than thirty or more than ninety days after receiving petitions, unless a regular election falls within the designated period. The appointees of the board of county commissioners and those nominated by petitions shall be placed on the ballot in alphabetical order without party designation. The voters may cast votes for, and elect a number of nominees equal to the number of charter board members originally selected by the board of county commissioners, and those so elected are the charter board. The charter board, within 18 months from the date of its appointment, or if there was an election for some of its members, within 18 months from the date of the election, shall present a proposed charter for the county to the board of county commissioners, which shall publish it at least twice in one or more newspapers of general circulation in the county within thirty days after it is presented. The charter shall be submitted to the voters of the county at a special or regular election held not earlier than thirty days or later than ninety days after publication of the charter. If a majority of the votes cast for and against the adoption of the

(continued . . . )

sought membership on the charter board submitted a petition, (collectively, "the Petitioners"), purportedly signed by 2,915 registered voters, requesting a special election to nominate additional charter board members. The Board denied the request, determining that the petition did not satisfy the requirements to hold a special election because many of the petition signatures were invalid under Section 6–203 of the Election Law Article of the Maryland Code.[10] Prior to the action at the heart of *Burruss*, in *Maryland State Board of Elections v. Libertarian Party*, 426 Md. 488, 492, 44 A.3d 1002, 1004 (2012), plaintiffs in Anne Arundel County filed an action challenging the legal standard the Maryland State Board of Elections applied in evaluating petition signatures, and the Circuit Court issued a declaratory judgment adopting the "sufficient cumulative information standard". The *Burruss* Petitioners filed for judicial review in the Circuit Court for Frederick County and

---

(. . . continued)

    charter are in favor of its adoption, the charter shall become effective as the charter of the county on the thirtieth day after the election or such later date as shall be specified in the charter.

[10] The relevant portion Section 6-203 of the Election Law Article provides:

    (b) *Validation and counting of signatures* — The signature of an individual shall be validated and counted if:
    (1) the requirements of subsection (a) of this section have been satisfied;
    (2) the individual is a registered voter assigned to the county specified on the signature page and, if applicable, in a particular geographic area of the county;
    (3) the individual has not previously signed the same petition;
    (4) the signature is attested by an affidavit appearing on the page on which the signature appears;
    (5) the date accompanying the signature is not later than the date of the affidavit on the page; and
    (6) if applicable, the signature was affixed within the requisite period of time, as specified by law.

attempted to invoke offensive non-mutual collateral estoppel to prevent the Board from relitigating the proper legal standard, based on the ruling in the *Libertarian Party* case. The Circuit Court Judge affirmed the Board's denial of the special election and declined to apply offensive non-mutual collateral estoppel because he found that the Board was not a party in the *Libertarian Party* case and that the issues in *Burruss* were different.

We granted certiorari and affirmed the decision of the Circuit Court Judge. We declined to apply the doctrine of offensive non-mutual collateral estoppel and noted that even "assuming that all the elements of non-mutual collateral estoppel are satisfied", its application was not appropriate. *Burruss*, 427 Md. at 252, 46 A.3d at 1194. We surveyed the Supreme Court's analysis of offensive non-mutual collateral estoppel in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S. Ct. 645, 58 L.Ed.2d 552 (1979), in which the Supreme Court discussed the dual policy concerns underlying the application of offensive non-mutual collateral estoppel, those being judicial economy and fairness:

> First, offensive use of collateral estoppel does not promote judicial economy in the same manner as defensive use does. Defensive use of collateral estoppel precludes a plaintiff from relitigating identical issues by merely "switching adversaries." *Bernhard v. Bank of America Nat. Trust & Savings Assn.*, 19 Cal. 2d, at 813, 122 P.2d, at 895.12 Thus defensive collateral estoppel gives a plaintiff a strong incentive to join all potential defendants in the first action if possible. Offensive use of collateral estoppel, on the other hand, creates precisely the opposite incentive. Since a plaintiff will be able to rely on a previous judgment against a defendant but will not be bound by that judgment if the defendant wins, the plaintiff has every incentive to adopt a "wait and see" attitude, in the hope that the first action by another plaintiff will result in a favorable judgment. *E. g., Nevarov v. Caldwell*, 161 Cal. App. 2d 762, 767–768, 327 P.2d 111, 115; *Reardon v. Allen*, 88 N.J. Super. 560, 571–572, 213 A.2d 26, 32. Thus offensive use of collateral estoppel will likely increase rather than decrease the total amount of litigation, since potential plaintiffs will have everything to gain and nothing to lose by not intervening in the first action.

A second argument against offensive use of collateral estoppel is that it may be unfair to a defendant. If a defendant in the first action is sued for small or nominal damages, he may have little incentive to defend vigorously, particularly if future suits are not foreseeable. *The Evergreens v. Nunan*, 141 F.2d 927, 929 (CA2); cf. *Berner v. British Commonwealth Pac. Airlines*, 346 F.2d 532 (CA2) (application of offensive collateral estoppel denied where defendant did not appeal an adverse judgment awarding damages of $35,000 and defendant was later sued for over $7 million). Allowing offensive collateral estoppel may also be unfair to a defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant. Still another situation where it might be unfair to apply offensive estoppel is where the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result.

*Id.* at 329-31, 99 S. Ct. at 650-51, 58 L.Ed.2d at 561-62. Considering the dual policy concerns and our review and subsequent vacation of the Anne Arundel County Circuit Court's ruling in *Libertarian Party*, 426 Md. at 522, 44 A.3d at 1022, we determined the application of offensive non-mutual collateral estoppel was not appropriate. We concluded its application would be inappropriate because the circuit court ruling in the *Libertarian Party* case was an incorrect interpretation of the law, and our holding in *Libertarian Party*, which vacated the circuit court ruling, "reaffirmed that the petition signature requirements in § 6–203(a) are mandatory", and thus, "it would be unfair to bind [the Board] to an interpretation of the law inconsistent with our holding in that case." *Burruss*, 429 Md. at 252, 46 A.3d at 1194.

The Shaders urge us to adopt and apply in their favor the doctrine of offensive non-mutual collateral estoppel[11] in the present case and argue that the *Duval* ruling, that the

---

[11] The Shaders, additionally, argue that they stand in the place of the defendant in this case

(continued . . . )

HIA "ha[s] waived the right to seek to enforce the provisions of Paragraph C of the Covenants by abandonment", collaterally estops the HIA from relitigating the enforcement of Paragraph C.

In *Duval*, the HIA had filed a declaratory and injunctive relief action against Duval Four-A, LLC, a Maryland limited liability company ("Duval"), that owned Lot 4A in Hampton. The Hampton Company, the original developer of the lots, had revised the original 1930 Plat in 1949 and reconfigured Lot 4 to create two additional lots: Lot 4A and Lot 4B. The HIA filed suit against Duval to prevent the construction of a dwelling on Lot 4A, and sought relief "based on the theory that the prohibition against the construction of more than one dwelling on a 'lot' refers to the 'lots' depicted in the 1930 Plat." After hearing testimony and argument of the parties, Judge Robert E. Cahill, Jr. of the Circuit Court for Baltimore County, denied relief to the HIA based on the 1949 revision of the 1930 Plat:

> 2. In 1949, a Revised Plat was filed by the Hampton Company which reconfigured the lot lines for several lots, and in fact, created Lot 4A, the lot owned by [Duval], and Lot 4B. Thereafter, on a least three of the lots depicted in the original 1930 Plat (Lots 18, 24 and 25) more than one dwelling was built per lot as those lots were originally configured on the 1930 Plat. Indeed, the evidence was undisputed that the dwelling which straddles what were depicted on the 1930 Plat as Lots 22 and 24 was built as recently as 2005 . . . .
> 3. There is no evidence that any of the lot owners in Hampton ever objected to the construction of more than one house per lot as the lots were depicted on the 1930 Plat in these three other cases (Lots 18, 24 and 25).

---

( . . . continued)
and, thus, are actually invoking the doctrine of *defensive* non-mutual collateral estoppel because they brought the action against the HIA to proactively determine their rights. We find no succor in this argument.

16

There is no evidence that the Hampton Improvement Association, Inc. ever objected. Neither the Plaintiffs, nor any of the other property owners in the subdivision sued or otherwise sought to enforce this interpretation of the covenant in these three situations, each of which involved lots oriented just adjacent to Lot 4A.

4. In addition, the testimony was undisputed that in some 30 instances in the subdivision, the Plaintiffs and their predecessors have permitted lot owners in Hampton to erect and maintain buildings other than single family dwellings and garages on their lots in violation of the very same covenant which they seek to enforce in this action.

(footnotes omitted). Judge Cahill concluded, "[b]ased on the fact that the Plat presently in effect portrays [Duval's] property as a separate lot, designated as Lot 4A, the construction of [Duval's] dwelling, as planned, will not frustrate the original intent or purpose of the covenants" and that the HIA "ha[s] waived the right to seek to enforce the provisions of Paragraph C of the Covenants by abandonment." In footnote four to his opinion, Judge Cahill attempted to limit the breadth of his decision:

The decision in this matter is limited to the facts of this case. This Court specifically does <u>not</u> conclude that the covenants are "void". This Court specifically does <u>not</u> conclude that the waiver defense would apply in any other action to enforce the covenants in the future. [12]

Although we may disagree with the ability of a trial court to specifically limit the application of non-mutual collateral estoppel, we decline to embrace the doctrine of offensive non-mutual collateral estoppel, under the circumstances in this case, because the issues in *Duval* differ from the issues in the Shaders's case. In the instant case, the Shaders's rely upon Judge Cahill's determination that the HIA "ha[s] waived the right to

---

[12] The Shaders argue that Judge Cahill was not entitled to limit the collateral estoppel effect of his ruling under Maryland law. We do not see the need to confront this argument as we do not rely on Judge Cahill's instruction in declining to apply collateral estoppel in this case.

seek to enforce the provisions of Paragraph C of the Covenants by abandonment." In her

denial of the Shaders's motion for summary judgment based upon the application of waiver

through collateral estoppel, Judge Cox specifically found that the issues in *Duval* were

dissimilar to those in the instant case:

> In the present case, the issues decided in the prior Duval matter are not identical to the issue presented in this case. While the issues are clearly related, the Shaders' property consists of one "original" lot and a portion of another lot that were joined in one parcel. The Shaders then sought to re-configure the lot line between these two parcels . . . .

We agree with the trial court.

We have not embraced the doctrine of offensive non-mutual collateral estoppel, but

even were we, the doctrine could not be applied in the present case because the issues

addressed in *Duval* are different from those queued up here. As the trial court found, *Duval*

dealt specifically with "a revision in the subdivision plat that was filed in 1949 that

reconfigured some of the original lot lines and created at least two new lots", whereas here,

the Shaders's property consists of one lot from the original 1930 Plat and a portion of

another lot that was joined in a single parcel.[13] The issues, thus, are dissimilar.

---

[13] The findings of the trial judge include:

> The evidence demonstrated that Lot 75 in the original 1930 subdivision plan was subdivided in the late 1940s. The eastern portion of Lot 75 that is currently owned by the Shaders was originally conveyed to Raymond Moore and Louise Moore on March 4, 1948. At the time of that conveyance, the property
> deed was encumbered by the following covenant:
>> It is expressly covenanted and agreed as part of the consideration for this Deed by the said Raymond and Louise S. Moore, his wife, for themselves, their heirs and assigns with the Hampton Company for itself, its successors and assigns, that at no time shall any dwelling be

(continued . . . )

18

## II. Waiver

We next address the Shaders's argument that the HIA waived by abandonment the restrictions within Paragraph C, by allowing the construction of numerous buildings such as pool houses, gazebos, guest houses and sheds. Paragraph C provides:

> The land included in said tract except as hereinafter provided shall be used for private residence purposes only and no building of any kind whatsoever shall be erected or maintained thereon except private dwelling houses each dwelling being designed for occupation by a single family and private garages for the sole use of the respective owners or occupants of the plots upon which such garages are erected there shall not be erected or maintained on said tract of land an apartment house or house designed or altered for occupation by more than one family and no more than one dwelling may be erected on a lot.

Judge Cox, after having heard testimony and reviewed the exhibits, some of which were photos depicting the structures, determined that the restriction prohibiting the construction of "no more than one dwelling" on a single lot was not waived by abandonment:

> With the exception of the caveat pertaining to garages, Covenant C clearly states that "no building of any kind whatsoever shall be erected or maintained thereon except private dwelling houses." Although the Shaders were able to show numerous instances of violations based upon construction of separate structures on properties throughout the community, they were unable to demonstrate construction of a second residence on a single lot. Rather, the evidence demonstrates that the HIA has consistently taken action to enforce the restriction in the Covenants that requires 'no more than one dwelling may be erected on a Lot.'
>
> Maryland law holds that restrictive Covenants may be abandoned in part without resulting in a wholesale abandonment of all restrictive Covenants. See King v. Waigand, 208 Md. 308, 313 (1955) ([h]olding, where a restrictive covenant prohibited the sale of "malt and spirituous liquors," the

---

(continued . . . )
> erected on the lot hereby conveyed.
> The largest portion of the original Lot 75 has a home on it.

> abandonment of the restriction on the sale of malt liquors, i.e. beer and wine, did not effect the enforcement of the restrictive covenant regarding the sale of "spirituous liquors."). Here, violations of the portion of the covenant prohibiting the construction of buildings other than residential dwellings does not necessarily mean that the restriction on building more than one residence per lot has been abandoned.
>
> The evidence at trial clearly demonstrated that the HIA has continuously enforced the restriction on building more than one residential dwelling per lot. This enforcement has allowed Hampton to remain a neighborhood of large, single family properties, with a low population density . . . . Here, the Covenant is still serving its purpose in ensuring the residential character of the neighborhood. The Shaders had constructive notice of the Covenants at the time they purchased their property. For these reasons, this Court does not find that the HIA has abandoned enforcement of the Covenant.

The Court of Special Appeals agreed, holding that "the circuit court did not err in concluding that the HIA did not waive the restriction prohibiting more than one house per lot, consistent with the original Plat filed in 1930." *Shader*, 217 Md. App. at 626, 94 A.3d at 250.

We have long recognized the equitable defense of waiver in restrictive covenant cases. *See City of Bowie v. MIE Properties, Inc,* 398 Md. 657, 697, 922 A.2d 509, 533 (2007) (citing numerous cases). In the context of restrictive covenants, "waiver deems unenforceable a covenant because some word or act of the [individual benefitting from the covenant] communicated to the [individual burdened by the covenant] that the covenant would not be enforced." *Id.* Waiver by abandonment occurs when an individual benefiting from a restrictive covenant relinquishes his or her right to enforce the covenant, because he or she has previously allowed a violation of the covenant by other individuals burdened by the covenant. *See id.* "[W]here conduct [related to the use of benefitted land] indicates the actor's intent to relinquish the benefit of the covenant, the doctrine [of abandonment]

20

prevents that person from gaining any benefit from the further existence of the obligation." Richard R. Powell, Powell on Real Property § 60.10[1] (2000). "Abandonment may be explicit, *e.g.*, through a written statement abandoning claim to benefit of the promise. Abandonment may also be implied by a court, usually by clear and convincing evidence, from actions that the court reads to show a definite, specific intent to abandon the covenant." 2 David A. Thomas, Thompson on Real Property § 61.07(b)(2)(iii), at 628 (2006). "The question of whether waiver has occurred is a question of fact, which is reviewed for clear error." *MIE Properties, Inc.*, 398 Md. at 699, 922 A.2d at 534 (internal citations omitted).

The Shaders urge that the trial court erred, because, they allege, the evidence adduced at trial demonstrates that the HIA, in fact, waived the restriction that "no building of any kind whatsoever shall be erected or maintained thereon except private dwelling houses" and the restriction prohibiting more than one residential dwelling per single lot, by permitting other prohibited buildings to be erected. They argue that they produced numerous exhibits with pictures of "out buildings" on other lots in Hampton, including photographs of pool houses, gazebos, guest houses and sheds and that, "[i]f the one house per lot restriction was designed to maintain a certain appearance within Hampton, it is beyond legitimate argument that allowing dozens and dozens of additional buildings, including guest houses, pool houses, apartments over garages, and the like, has completely altered the concept spelled out in the Covenants."

The HIA conversely alleges that the existence of other non-residential buildings on lots does not result in an abandonment of the restriction prohibiting the construction of

21

multiple residences on a single lot because the other buildings are not single family dwellings, and it only enforced the restriction when a property owner sought to increase the residential density of Hampton by constructing an additional residence on a single lot.[14]

Judge Cox specifically found that there had not been construction of a second residence on a single lot in the community, and this factual finding is supported by the record. As a result, the HIA did not engage in a waiver by abandonment of the clause in Paragraph C restricting the construction of more than one dwelling per single lot, consistent with the original 1930 Plat, and we so hold.

The Shaders argue, though, alternatively, that the HIA, by allowing the erection of pool houses, gazebos, guest houses and sheds in violation of the clause restricting the erection of "building[s] of any kind . . . except private dwelling houses" triggers a waiver of the entirety of Paragraph C.

Judge Cox found, with respect to the alleged waiver of the entirety of Paragraph C, "that restrictive Covenants may be abandoned in part without resulting in a wholesale abandonment of all restrictive Covenants." She noted that, "[h]ere, violations of the portion

---

[14] The Shaders and the HIA argue, additionally, that the Covenants are not enforceable or enforceable based on the standard of "changed relevant circumstances" in the surrounding neighborhood, which they conflate with the standard for waiver by abandonment. When a covenant is challenged based on changed relevant circumstances, "[t]he proper legal standard for this inquiry is to examine whether, after the passage of a reasonable period of time, the continuing validity of the covenant cannot further the purpose for which it was formed in light of changed relevant circumstances." *City of Bowie v. MIE Properties, Inc.*, 398 Md. 657, 685, 922 A.2d 509, 526 (2007). In contrast, waiver by abandonment focuses on violations of the covenant in areas of land subject to covenant aside from the property at issue in the suit. *Id.* at 698 n.27, 922 A.2d at 534 n.27. As a result, we do not need to address any issues related to a change in relevant circumstances.

of the covenant prohibiting the construction of buildings other than residential dwellings does not necessarily mean that the restriction on building more than one residence per lot has been abandoned". She concluded that the purpose of Paragraph C was to ensure the residential character of the neighborhood and that the HIA's enforcement of the provision restricting the building of more than one residential dwelling per lot "has allowed Hampton to remain a neighborhood of large, single family properties, with a low population density". As a result, she determined that the HIA had not abandoned enforcement of the restriction on the construction of more than one residence per single lot.

The Court of Special Appeals agreed with Judge Cox "that restrictions in a set of covenants may be severable." *Shader*, 217 Md. App. at 622, 94 A.3d at 248. Our intermediate appellate court opined:

> The second clause, which defines the acceptable appurtenances for each single family dwelling, is the clause that the circuit court found was violated due to evidence of additional buildings, such as sheds, gazebos and pool houses on various lots in Hampton. Permitting the HIA to expand the concept of garage or building does not destroy the purpose of Paragraph C, so long as these buildings are appurtenant to and for the use of one single family dwelling. For this Court to hold that the abandonment of one restriction in Paragraph C results in the abandonment of all restrictions would be inequitable. Hampton could lose its aesthetic character and low residential density, as homeowners would be able to subdivide their lots and construct multiple dwellings and units to the limits of applicable zoning regulations. This would defy the clear intent of Paragraph C of the Covenants: to restrict the use of each lot in Hampton to residential, single-family purposes. As the Court of Appeals has instructed, we "'are under a duty to effectuate rather than defeat an intention which is clear from the context, the objective sought to be accomplished by the restriction and from the result that would arise from a different construction.'" *MIE Props., Inc., supra,* 398 Md. at 680, 922 A.2d 509 (quoting *Belleview Construction Co., supra,* 321 Md. at 157–58, 582 A.2d 493). Therefore, we hold that the circuit court did not err in

concluding that the HIA did not waive the restriction prohibiting more than one house per lot, consistent with the original Plat filed in 1930.

*Id.* at 624-26, 94 A.3d at 249-50 (internal footnote omitted).

We agree that the HIA waived the clause in Paragraph C restricting the erection of "building[s] of any kind . . . except private dwelling houses" by allowing the erection of pool houses, gazebos, guest houses and sheds in violation of the clause. Nonetheless, restrictions in a set of covenants may be severable from one another. *See* Powell, *supra*, § 60.10[1] (2000) (In the similar doctrine of acquiescence, "[a]cquiescence in the violation of one restriction does not constitute acquiescence in the violation of a different restriction unless the violation defeats the object of the entire plan.").[15]

> Paragraph C can be divided into four separate and independent clauses:
>
> [1.] The land included in said tract except as hereinafter provided shall be used for private residence purposes only and
> [2.] no building of any kind whatsoever shall be erected or maintained thereon except private dwelling houses each dwelling being designed for occupation by a single family and private garages for the sole use of the respective owners or occupants of the plots upon which such garages are erected
> [3.] there shall not be erected or maintained on said tract of land an apartment house or house designed or altered for occupation by more than one family and
> [4.] no more than one dwelling may be erected on a lot.

---

[15] Various of our sister courts also have held that clauses in restrictive covenants may be severable. *See Dauphin Island Prop. Owners Ass'n v. Kuppersmith,* 371 So.2d 31, 34 (Ala. 1979) ("[W]e hold that any failure of the Association to enforce the two-tie pilings restriction did not constitute estoppel by acquiescence to assert either the height and roof restrictions or the building permit restriction."); *Swaggerty v. Petersen,* 572 P.2d 1309, 1314 (Or. 1977) ("Assuming that plaintiffs were, or should have been, aware of these violations [in a series of restrictions] and failed to object to them does not preclude them from suing to enforce the density restrictions. The right to enforce one restrictive covenant is not lost by acquiescence in the violation of another restriction." (citations omitted)).

Severing of the second clause restricting the construction of any building aside from a private dwelling house or private garage would not frustrate the purpose of the covenants, which the Circuit Court found was to "ensur[e] the residential character of the neighborhood", as the additional buildings are not dwellings.

We hold, therefore, that the Circuit Court did not err in determining that the HIA did not waive the clause in Paragraph C restricting the erection of more than one dwelling house on a single lot by allowing the erection of sheds, pool houses, gazebos and guest houses in violation of the clause restricting the erection of "building[s] of any kind . . . except private dwelling houses", because that clause is severable from the other covenants in Paragraph C.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONERS.**