*Wayne Garrity, Sr. v. Maryland State Board of Plumbing*, No. 35, September Term 2015

**CIVIL PROCEDURE — COLLATERAL ESTOPPEL —** Offensive non-mutual collateral estoppel applies when a plaintiff seeks to establish as undisputed a fact that another plaintiff previously litigated adversely to the defendant. This form of collateral estoppel cannot be applied unless the trial court determines that principles of judicial economy would not be compromised and the doctrine's application would not be unfair to the defendant. Principles of judicial economy and fairness are served by application of offensive non-mutual collateral estoppel in the case of two administrative proceedings where the second agency could not have joined the first agency's proceeding and the same facts support violations of the respective agency's statutes.

**FIFTH AMENDMENT — DOUBLE JEOPARDY —** Whether a penalty can be characterized as criminal punishment subject to the Double Jeopardy Clause is first a matter of statutory construction. The court must determine whether the General Assembly reflected an intention for the penalty to be civil or criminal. Even if the General Assembly intended the penalty to be civil, the court must determine whether the penalty is nevertheless "so punitive either in purpose or effect" that the penalty should be characterized as criminal. There is no double jeopardy violation when an administrative agency imposes a monetary penalty on a merchant for violating consumer protection laws because that penalty is civil, rather than criminal.

Circuit Court for Baltimore City
Case No. 24-C-13-004631
Argued: December 4, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 35

September Term, 2015

WAYNE GARRITY, SR.

v.

MARYLAND STATE BOARD OF
PLUMBING

Barbera, C.J.
*Battaglia
Greene
Adkins
McDonald
Watts
Harrell, Jr., Glenn T., (Retired,
Specially Assigned),

JJ.

Opinion by Barbera, C.J.
Adkins, J., concurs.

Filed: April 26, 2016

*Battaglia, J., now retired, participated in the hearing and conference of the case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

To date, Maryland has not adopted formally the doctrine of offensive non-mutual collateral estoppel. We are asked to decide in the present case whether the doctrine is permissible in this State and, further, whether it can be invoked to grant preclusive effect to an administrative order. We hold that offensive non-mutual collateral estoppel was properly applied in this case, and that a Final Order issued by an administrative body constitutes a "final judgment" for purposes of granting that order preclusive effect. We also hold that the civil penalty imposed upon Petitioner, for the same conduct for which Petitioner was civilly sanctioned in an earlier proceeding, does not violate the Double Jeopardy Clause.

I.

On February 23, 2012, the Consumer Protection Division of Maryland's Office of the Attorney General ("CPD") issued a Statement of Charges and Petition for Hearing[1] against Petitioner, Wayne Garrity, Sr., and his companies, All State Plumbing, Inc. and All State Plumbing, Heating & Cooling, Inc. ("All State"). The CPD alleged that Petitioner and All State engaged in unfair and deceptive trade practices in violation of the Maryland Consumer Protection Act ("CPA"). *See* Md. Code Ann., Com. Law ("CL") § 13-303 (2011, 2013 Repl. Vol.).[2] The CPD alleged that, over a period spanning at least five years,

---

[1] The CPD is authorized to issue a statement of charges to an alleged violator of the Consumer Protection Act and to hold a hearing to determine whether the individual violated the Act. Md. Code Ann., Com. Law ("CL") § 13-403(a) (2005, 2013 Repl. Vol.).

[2] CL § 13-303 provides:
    A person may not engage in any unfair or deceptive trade practice, as defined
    in this subtitle or as further defined by the Division, in:
        (1) The sale, lease, rental, loan, or bailment of any consumer goods,

Petitioner, through All State, retained unlicensed plumbers; failed to obtain required permits and inspections for job sites; misrepresented to consumers that his employees were licensed and would obtain the requisite permits and inspections; and charged consumers for services he did not provide. Also on February 23, 2012, the CPD entered an Order Granting Hearing and Notification of Hearing, designating the Office of Administrative Hearings to conduct the hearing on the Statement of Charges.

The CPD and Petitioner participated in a hearing on June 5 and 6, 2012, before an Administrative Law Judge ("ALJ"), as the designee of the CPD.[3] At the hearing, the CPD

---

consumer realty, or consumer services;
(2) The offer for sale, lease, rental, loan, or bailment of consumer goods, consumer realty, or consumer services;
(3) The offer for sale of course credit or other educational services;
(4) The extension of consumer credit;
(5) The collection of consumer debts; or
(6) The purchase or offer for purchase of consumer goods or consumer realty from a consumer by a merchant whose business includes paying off consumer debt in connection with the purchase of any consumer goods or consumer realty from a consumer.

"Unfair or deceptive trade practices" are defined in depth at CL § 13-301.

[3] COMAR 02.01.02.02 explains the CPD's dual roles in these proceedings: one as the "administrative agency authorized to adjudicate contested cases under Commercial Law Article, § 13-403, and State Government Article, § 10-202(b)," and the other as "a party to a contested case." COMAR 02.01.02.04 authorizes the CPD, in an adjudicatory capacity, to hold contested case hearings or to designate that authority to the Office of Administrative Hearings, which it did in this case. When the Office of Administrative Hearings is designated to preside over a contested case hearing, the administrative law judge is required to prepare proposed findings of fact and conclusions of law, and the agency—here, the CPD—is required to review those proposed findings and conclusions and issue a final order. *See* Md. Code Ann., State Gov't ("SG") § 10-220(a) (1993, 2014 Repl. Vol.). That order "may include the Office's proposed findings, conclusions, or order with or without modification." *Id.* § 10-220(c).

submitted 84 exhibits and called 24 witnesses to testify. Petitioner submitted only one exhibit and called no witnesses and, when called upon to testify by the CPD, invoked his Fifth Amendment right against compelled self-incrimination. Both parties submitted post-hearing Proposed Findings of Fact and Conclusions of Law. The ALJ submitted a Proposed Decision on November 7, 2012, finding that Petitioner violated the CPA as charged by the CPD. Neither party filed exceptions to the Proposed Decision.

Consequently, on January 3, 2013, the final decision maker designated by the CPD in its quasi-judicial capacity issued written findings of fact and conclusions of law. The designee found that Petitioner, through All State, "engaged in a longstanding and disturbing pattern of conduct involving deception and deceit." The CPD designee found in particular that Petitioner employed three plumbers whose licenses had either expired or been suspended, and who performed more than 6,000 plumbing jobs without a license. The CPD further found that Petitioner charged customers between $95 and $175 for permits for certain plumbing services, yet regularly failed to obtain the required permits or schedule the required inspections for water heaters installed in at least 697 Maryland homes. The CPD designee concluded by a preponderance of the evidence that Petitioner committed at least 7,079 violations of the CPA through the above-described conduct.[4]

The CPD contemporaneously issued a Final Order adopting those findings and conclusions and issuing sanctions for Petitioner's violations of the CPA. The CPD ordered

---

[4] The CPD noted that there was evidence that Petitioner committed more than that number of violations but that the CPD could not prove them because Petitioner failed to cooperate in discovery, destroyed his service records, and refused to testify at the hearing.

3

Petitioner to cease and desist engaging in unfair and deceptive trade practices and pay $250,000 in restitution to the victims. The CPD also imposed $707,900 in civil penalties and assessed costs in the amount of $65,129.54. *See* CL § 13-410(a) (providing that an individual who violates the CPA "is subject to a fine of not more than $1,000 for each violation"); CL § 13-409 ("In any action brought by the Attorney General under the provisions of this title, the Attorney General is entitled to recover the costs of the action for the use of the State."). Neither Petitioner nor the CPD sought judicial review of the CPD's decision.

Thereafter, Respondent, the Maryland State Board of Plumbing ("the Board"), upon review of the decision of the CPD, opened a complaint against Petitioner.[5] Following unsuccessful efforts to obtain requested information from Petitioner, the Board issued a Notice of Charges and Order for Hearing ("Charge Letter"). The Charge Letter alleged that Petitioner had violated the Maryland Plumbing Act ("MPA") by providing incompetent or negligent plumbing services; failing to obtain permits required by local jurisdictions; engaging in unfair trade practices; knowingly permitting employees to work outside the scope of their licenses; and employing unlicensed persons to participate in the provision of plumbing services. *See* Md. Code Ann., Bus. Occ. & Prof. ("BOP") §§ 12-

---

[5] The Board of Plumbing is a unit within the Maryland Department of Labor, Licensing, and Regulation. Similar to the CPD, COMAR 09.01.02.02B(3) empowers the Board to adjudicate a contested case against a respondent to determine whether the respondent violated the Maryland Plumbing Act. COMAR 09.01.02.02B(17) authorizes an "attorney assigned by the Office of the Attorney General to . . . [p]resent charges and evidence against a respondent[.]" Consequently, much like the CPD, the Board acts both as a proponent of evidence and as an adjudicatory body. The Board is likewise required to issue a final order after considering all of the evidence produced at the hearing. COMAR 09.01.02.20.

312(a)(1) and 12-602(a) (2004, 2010 Repl. Vol.). The Charge Letter incorporated by reference the CPD's Final Order. At the hearing before the Board, counsel for the Board moved to admit the CPD's Final Order as evidence in its case in chief. Although the Board admitted eight exhibits and called two witnesses—one of whom was Petitioner, who again refused to testify pursuant to his Fifth Amendment privilege—the Board's case largely consisted of the CPD's findings and conclusions.

Petitioner's counsel objected to the introduction of the CPD's Final Order, arguing that the Board must conduct its own evidentiary hearing and prove independently the violations of which Petitioner was charged. Counsel for the Board responded that Petitioner was collaterally estopped from relitigating the same facts as were litigated before the CPD and determined finally in the CPD's Final Order. The Board admitted the CPD's Final Order but did not state specifically that the Board would give that Final Order preclusive effect. Petitioner did not seek to postpone the hearing until the Board ruled on that issue.

The Board issued a Final Decision and Order on July 9, 2013. The Board, by application of the doctrine of collateral estoppel, adopted the findings of fact made by the CPD and, based upon those findings, concluded that Petitioner had committed "pervasive, numerous and egregious" violations of the MPA as alleged in the Charge Letter. The Board revoked Petitioner's master plumber license and imposed a $75,000 civil penalty.[6]

---

[6] *See* Md. Code Ann., Bus. Occ. & Prof. ("BOP") § 12-312(a) (2004, 2010 Repl. Vol.) (authorizing the Board to revoke a plumbing license upon a finding that the licensee violated the MPA by, among other violations, negligently or incompetently providing plumbing services or engaging in unfair and deceptive trade practices); BOP § 12-607(d)

Petitioner petitioned for judicial review of the Board's decision in the Circuit Court for Baltimore City, which ruled that the Board properly invoked collateral estoppel in adopting the CPD's findings of fact. The Court of Special Appeals affirmed, *Garrity v. Md. State Bd. of Plumbing*, 221 Md. App. 678, 681 (2015), and we granted Petitioner's petition for a writ of certiorari to answer two questions, which we have rephrased:

1. Did the Maryland State Board of Plumbing correctly invoke the doctrine of offensive non-mutual collateral estoppel and use it to preclusive effect against Petitioner?

2. Were Petitioner's double jeopardy protections violated when the Maryland State Board of Plumbing and the Consumer Protection Division both fined him for the same conduct?

We answer yes to the first question and no to the second, and consequently affirm the judgment of the Court of Special Appeals.

II.

*Application of Collateral Estoppel*

In our review of an administrative action, we look through the decision of the circuit court and review that agency action directly. *People's Counsel for Balt. Cty. v. Surina*, 400 Md. 662, 681 (2007). We review the Board's adjudicatory decision for whether there was "substantial evidence in the record as a whole to support the agency's findings and conclusions" and whether the Board's decision was "premised upon an erroneous conclusion of law." *Md. Aviation Admin. v. Noland*, 386 Md. 556, 571 (2005). Whether it was appropriate to grant preclusive effect to the CPD's Final Order, however, is a legal

_____

(authorizing the Board to fine an individual $5,000 for each violation of subtitle 6 of the MPA).

6

conclusion that this Court reviews *de novo*. *See Spencer v. Md. State Bd. of Pharmacy*, 380 Md. 515, 528 (2004).

The doctrine of collateral estoppel provides that, "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *Cosby v. Dep't of Human Res.*, 425 Md. 629, 639 (2012) (alteration in original) (quoting *Murray Int'l Freight Corp. v. Graham*, 315 Md. 543, 547 (1989)). The doctrine is based on two principles: judicial economy and fairness. Treating adjudicated facts as established "protect[s] litigants from the burden of relitigating an identical issue with the same party or his privy and . . . promot[es] judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979). The collateral estoppel doctrine has several permutations, each dependent upon the posture of the party attempting to assert it.

Traditionally, collateral estoppel contemplates a "mutuality of parties," meaning that an issue that was litigated and determined in one suit will have preclusive effect in a second suit when the parties are the same as, or in privity with, those who participated in the first litigation. *Rourke v. Amchem Prods., Inc.*, 384 Md. 329, 340-41 (2004); *Welsh v. Gerber Prods., Inc.*, 315 Md. 510, 516 (1989). The mutuality requirement has been relaxed, however, so long as the other elements of collateral estoppel are satisfied. *See Rourke*, 384 Md. at 349. If either the defendant or the plaintiff in the second proceeding was not a party to the first proceeding, we refer to that application of collateral estoppel as "non-mutual." *Id.* at 341. Mutual and non-mutual collateral estoppel are further

characterized as either "defensive" or "offensive: estoppel is "defensive" if applied by a defendant and "offensive" if invoked by a plaintiff. *See Shader v. Hampton Improvement Ass'n*, 443 Md. 148, 162-63 (2015). Regardless of the particular permutation, this Court has required that four questions be answered affirmatively before collateral estoppel can be applied:

> 1. Was the issue decided in the prior adjudication identical with the one presented in the action in question?
> 2. Was there a final judgment on the merits?
> 3. Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?
> 4. Was the party against whom the plea is asserted given a fair opportunity to be heard on the issue?

*Colandrea v. Wilde Lake Cmty. Assoc.*, 361 Md. 371, 391 (2000) (quoting *Washington Suburban Sanitary Comm'n v. TKU Assocs.*, 281 Md. 1, 18-19 (1977)).

At issue in the present case is "offensive non-mutual collateral estoppel," whereby a plaintiff seeks to establish as undisputed a fact that was previously litigated adversely to the defendant by another plaintiff. *Shader*, 443 Md. at 163. We recently explained the distinction between offensive non-mutual collateral estoppel and defensive non-mutual collateral estoppel:

> *Defensive* non-mutual collateral estoppel has been invoked in Maryland, when a defendant seeks to prevent a plaintiff from relitigating an issue the plaintiff has previously litigated unsuccessfully in another action against a different party. The doctrine of *offensive* non-mutual collateral estoppel has not been embraced and applied by this Court, but has been invoked by other courts when a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against a different party.

*Id.* at 162-63 (citations and internal quotation marks omitted).

8

The Supreme Court applied this particular permutation in *Parklane*, to which we look in considering whether to adopt the doctrine in the case before us. In *Parklane*, shareholders of the corporation sought to grant preclusive effect to facts found in an earlier civil suit brought by the Securities and Exchange Commission ("SEC") against the same defendants. 439 U.S. at 324-25. Although concluding in the end that the doctrine was permissible in an appropriate case, the *Parklane* Court recognized certain concerns attendant to applying non-mutual collateral estoppel offensively. *Id.* at 329.

The *Parklane* Court recognized that offensive application of the doctrine "does not promote judicial economy in the same manner as defensive use does." *Id.* That is so because, while defensive collateral estoppel incentivizes plaintiffs to join all potential defendants in a single action, offensive collateral estoppel provides the opposite motivation. *Id.* at 329-30. "[T]he plaintiff has every incentive to adopt a 'wait and see' attitude, in the hope that the first action by another plaintiff will result in a favorable judgment" because the plaintiff can rely on that favorable judgment against the defendant but is not bound by it if the defendant is successful. *Id.* at 330. The Court also acknowledged the potential for unfairness. *Id.* The defendant may not have had an incentive to defend vigorously against the first litigation if, for example, only "small or nominal damages" were previously at issue and a future suit was not foreseeable. *Id.* It might also be unfair if the judgment relied upon was "itself inconsistent with one or more previous judgments in favor of the defendant," or the second action allowed "procedural opportunities unavailable in the first action that could readily cause a different result." *Id.* at 330-31.

9

The *Parklane* Court concluded, however, that those potential judicial economy and fairness concerns did not preclude the doctrine's application in that case. *Id.* at 331. The Court noted that a shareholder could not have joined the SEC's lawsuit, rendering inapplicable the judicial economy concern. *Id.* at 331-32. Similarly, the Parklane defendants had every incentive to defend vigorously against the SEC's lawsuit, given the serious allegations and "the foreseeability of subsequent private suits that typically follow a successful Government judgment." *Id.* at 332. The Court ultimately held that the Parklane defendants "received a 'full and fair' opportunity to litigate their claims in the SEC action," and consequently were collaterally estopped from relitigating the facts that were already adjudicated adversely to them in that proceeding. *Id.* at 332-33.

The *Parklane* Court instructed, however, that because of its negative implications, trial courts should have broad discretion to determine when offensive non-mutual collateral estoppel should be applied. *Id.* at 331. "The general rule should be that in cases where a plaintiff could easily have joined in the earlier action or where, either for the reasons discussed above or for other reasons, the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel." *Id.*

We have iterated the *Parklane* Court's concerns about offensive non-mutual collateral estoppel in several cases in which its application was sought. Yet, for one reason or another, in none of those cases have we expressly adopted or rejected that particular permutation. Rather, in each case in which we have been asked to apply it, the particulars of the case have counseled against doing so.

In *Rourke*, we determined that conflict of laws principles and the federal

Constitution's full faith and credit requirement precluded us from applying collateral estoppel to a Virginia judgment that held an issue was not arbitrable. 384 Md. at 342-43. Citing the concerns outlined in *Parklane*, we concluded that, because the Virginia Supreme Court expressly rejected offensive non-mutual collateral estoppel, we could not give "any greater preclusive effect to the Virginia judgment than Virginia would give to it." *Id.* at 343. Although we recognized that "we have yet to formally embrace" the doctrine, we ultimately applied Virginia, rather than Maryland, law. Our lack of any formal adoption of the doctrine did not drive our decision. *Id.* at 349, 351.

Later, in *Burruss v. Board of County Commissioners of Frederick County*, 427 Md. 231 (2012), we were asked to grant preclusive effect to a determination by the Circuit Court for Anne Arundel County that a "sufficient cumulative information" standard applied to signature verification for purposes of requesting a special election for a board of county commissioners. *Id.* at 245. We echoed the Supreme Court's concern in *Parklane* that "offensive use of non-mutual collateral estoppel may be unfair 'if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant.'" *Id.* at 252 (quoting *Parklane*, 439 U.S. at 330). Because we had vacated on appeal the decision of the Circuit Court for Anne Arundel County, upon which the petitioners sought to rely, we concluded that "it would be unfair to bind Respondents to an interpretation of the law inconsistent with our holding in that case." *Id.*

We most recently considered the propriety of offensive use of non-mutual collateral estoppel in *Shader*. There, a restrictive covenant binding property owned by the petitioners provided that "no building of any kind whatsoever shall be erected or maintained thereon

11

except private dwelling houses" and "no more than one dwelling may be erected on a lot." 443 Md. at 152-53. When the petitioners—whose property consisted of one lot and a portion of another lot—subdivided their property and listed the new parcel for sale to be built upon, the homeowners' association, HIA, notified the petitioners that the restrictive covenant precluded any further building on the parcel. *Id.* The petitioners sought to invoke offensive non-mutual collateral estoppel to prevent HIA from applying the restrictive covenant against them because the covenant was not enforced in an earlier action adjudged against HIA, *Cortezi v. Duval Four-A, LLC*, No. C-07-002587 (Cir. Ct. Balt. Cty. 2008). *Shader*, 443 Md. at 155-56. In *Duval*, the developer had revised the 1930 Plat that created the community and reconfigured one lot to create two additional lots. *Id.* at 167. HIA sought to prevent Duval Four-A from constructing a dwelling on one of the new lots, reasoning that the covenant's prohibition on construction of more than one dwelling on a lot intended to preserve the lots as they were originally depicted on the 1930 Plat. *Id.* The court in *Duval* held that HIA had waived that argument because, on previous occasions, it had not objected to additional construction on lots as they were depicted on the 1930 Plat, which also would have violated the covenant. *Id.* at 167-68. The court in *Duval* therefore held that HIA had waived application of the covenant under those circumstances. *Id.* at 168.

The circuit court in *Shader* concluded that collateral estoppel was not appropriate because the issue in that case was not identical to the specific matter at issue in the earlier litigation. *Id.* at 169. The court reasoned that the petitioners were attempting to reconfigure a parcel that consisted of two different lots, whereas *Duval* was concerned with a

12

reconfiguration within a single lot. *Id.* Moreover, the court emphasized that HIA was only deemed to have waived the covenant in *Duval* as to structures other than single family dwellings, but did not abandon enforcement of the covenant as a whole. *Id.* at 159. We agreed with the circuit court's analysis, recognizing that "[w]e have not embraced the doctrine of offensive non-mutual collateral estoppel, but even were we, the doctrine could not be applied in the present case." *Id.* at 169; *cf. Attorney Grievance Comm'n v. Bear*, 362 Md. 123, 131, 134 (2000) (declining to give preclusive effect to a District of Columbia civil judgment because the burden of proof in the latter attorney grievance case was higher than the preponderance standard applicable to the earlier civil suit).

We glean from all three of these cases, *Rourke*, *Burruss*, and *Shader*, that we have not formally adopted this particular form of collateral estoppel, and each of our decisions to date has reiterated the caution outlined in *Parklane*. In none of these cases, though, have all four elements of the doctrine been established and each concern articulated in *Parklane* been satisfied. *See Parklane*, 439 U.S. at 331. None of those cases, therefore, counsels against application of offensive non-mutual collateral estoppel when that application is appropriate.

The Court of Special Appeals was presented such an appropriate case in *Culver v. Maryland Insurance Commissioner*, 175 Md. App. 645 (2007). This Court had previously disbarred Mr. Culver after concluding that he violated several of our rules of professional conduct, including those prohibiting conduct involving dishonesty, deceit, or misrepresentation. *Attorney Grievance Comm'n v. Culver*, 381 Md. 241, 266-83 (2004). Thereafter, the Maryland Insurance Administration ("MIA") revoked Mr. Culver's

insurance producer's license on the ground that he was deemed untrustworthy and therefore did not meet the statutory requirements for such a license. *Culver*, 175 Md. App. at 649-51; *see* Md. Code Ann., Ins. § 10-126(a)(13) (2002, 2011 Repl. Vol.) (authorizing the Insurance Commissioner to revoke a license if the holder "has otherwise shown a lack of trustworthiness or competence to act as an insurance producer"). Mr. Culver challenged the revocation at a hearing before an ALJ, at which he sought to contest the findings that formed the basis for the sanction we imposed. *Id.* at 650. The ALJ concluded that a further evidentiary hearing on the matter was unnecessary because the findings in the disbarment action established Mr. Culver's dishonesty and untrustworthiness and, consequently, the MIA was entitled to revoke Mr. Culver's license. *Id.*

The Court of Special Appeals concluded that the judicial economy and fairness considerations articulated in *Parklane*, later repeated by us in *Rourke*, would not be implicated by applying offensive non-mutual collateral estoppel. *Id.* at 656. With respect to judicial economy, the MIA as a regulatory agency "is charged with protecting consumers from untrustworthy insurance producers by revoking or denying their licenses," rendering inapplicable the "wait and see" attitude often present with private plaintiffs. *Id.* The Court of Special Appeals concluded that it was not unfair for Mr. Culver to be collaterally estopped from relitigating the facts supporting his disbarment because he had sufficient incentive to defend against those allegations and there were no procedural protections afforded in the MIA action that could lead to an inconsistent result. *Id.*

In the absence of any judicial economy or fairness concerns, the Court of Special Appeals held that the four-factor test, set forth in *Colandrea*, 361 Md. at 391, was also

satisfied and accordingly granted our disbarment action preclusive effect. *Id.* at 657-58. "The action resulting in appellant's disbarment was certainly a final judgment on the merits; appellant was a party to that action; and appellant was provided a fair opportunity to be heard by the Court of Appeals." *Id.* at 657. The Court of Special Appeals rejected Mr. Culver's suggestion that in such a circumstance the ALJ was nevertheless "required to make independent findings of fact." *Id.* at 658. Instead, the court concluded that the exercise was unnecessary because the facts supporting our conclusion that Mr. Culver had engaged in dishonest conduct were identical to those that Mr. Culver sought to challenge before the ALJ. *Id.*

For reasons we shall explain, the reasoning espoused by the Court of Special Appeals in *Culver* applies equally here. Not one of the concerns articulated in *Parklane*, as reflected in our precedent, is present in this case; in addition, the Board established the presence of all of the factors necessary to invoke offensive non-mutual collateral estoppel. We therefore conclude that the doctrine was applied properly in the Board's administrative proceeding.

### A. Judicial Economy and Fairness

Granting preclusive effect to the CPD's Final Order in this case comports with principles of judicial economy and fairness. Just as in *Parklane*, where the Court recognized that the shareholder could not have joined the first litigation instituted by the SEC, the Board likewise could not have joined the CPD's proceeding. *See* 439 U.S. at 331-32. Both are administrative agencies, and both are constrained to charge violations of their own statutes. *See* BOP § 12-208; *accord* CL § 13-403. In that regard, much like the

Insurance Commissioner's role in *Culver*, the Board's role in instituting proceedings such as this one is to ensure that only qualified individuals are entrusted to "protect the integrity of the potable water supply" and "provide for the efficient and safe discharge of storm drainage and sanitary drainage." *See* BOP § 12-102. The Board's actions, therefore, "did not constitute the kind of 'wait and see' attitude that troubled the *Parklane Hosiery* court." *See Culver*, 175 Md. App. at 656. Moreover, Petitioner failed to undertake any effort to present a defense before the CPD, and similarly failed to call any witnesses or submit any exhibits before the Board. Requiring the Board to present the same evidence already presented to the CPD, to establish the same set of facts, would be a waste of resources. As a result, principles of judicial economy, or, in this case, quasi-judicial economy, are served, rather than compromised, by precluding Petitioner from relitigating facts in the Board proceeding that were already established by the CPD. *See id.*

Nor is it unfair to Petitioner to apply collateral estoppel in this case. Petitioner had every "incentive to defend vigorously" the CPD's allegations. *See id.* Each violation of the CPA is susceptible to a $1,000 fine and Petitioner ultimately was adjudged to have committed over 7,000 violations. As the Court of Special Appeals emphasized, a penalty of more than $700,000 cannot be characterized as "small and nominal," particularly for an individual running a small business. *Garrity*, 221 Md. App. at 692. And, just as a subsequent shareholder class action suit was foreseeable after a successful SEC judgment in *Parklane*, Petitioner acknowledged before us that the Board's initiation of a proceeding to revoke his license was a foreseeable consequence of an adverse ruling from the CPD. *See* 439 U.S. at 332. *Parklane*'s concern that it might be unfair "if the judgment relied

16

upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant" does not apply here, because Petitioner did not receive any favorable ruling. *See Parklane*, 439 U.S. at 330.

And, finally, there is also no concern that there were different "procedural opportunities" in the two proceedings. Each proceeding was brought by an administrative agency that conducted a contested case administrative hearing in conformance with the Administrative Procedure Act. *See* Md. Code Ann., State Gov't ("SG") § 10-201 *et. seq.* (1993, 2014 Repl. Vol.). Both sides in each proceeding were permitted to make opening statements and closing arguments, offer evidence, call witnesses, and cross-examine any witness. COMAR 28.02.01.20A; 09.01.02.13E, G. The admissibility of evidence in each proceeding was governed by SG § 10-213. COMAR 02.01.02.16; 09.01.02.14. The proponent of the evidence on behalf of each agency bore the burden of proving violations of the respective statutes by a preponderance of the evidence. COMAR 02.01.02.05; 09.01.02.16. Both adjudicatory bodies were required to consider all of the testimony and evidence and thereafter issue a final order explaining the disposition. COMAR 28.02.01.25; 09.01.02.20. And the aggrieved party in both proceedings was entitled to seek judicial review of the final decision rendered by the agency. SG § 10-222.

Petitioner notes that the Board's decision is rendered by a panel of plumbers and consumers rather than an ALJ, but he fails to explain how this distinction led to "procedural opportunities unavailable in the first action that could readily cause a different result." *Parklane*, 439 U.S. at 331. Upon our review of the transcript of the Board's proceeding and insofar as the record otherwise reflects, the two administrative hearings proceeded in

17

much the same way. Petitioner had every opportunity to present evidence or testimony before the CPD and the Board but chose not to do so, and his admissible evidence would have been accepted and considered the same way in each proceeding. Indeed, Petitioner acknowledged at oral argument before us that there was nothing procedurally unfair about either administrative hearing. In sum, where the CPD was "applying statutes designed to protect consumers in highly-regulated industries," we, like the Court of Special Appeals, "see no unfairness here in preventing [Petitioner] from relitigating the question of his deceptive plumbing practices." *Garrity*, 221 Md. App. at 693.

### B. *The Finality of an Administrative Final Order*

Given our conclusion that application of offensive collateral estoppel would be equitable in this case, it remains for us to decide whether the elements of that doctrine are satisfied. Petitioner concedes that the first, third, and fourth prongs are established, as indeed he must. The issues in the two proceedings are identical; both were concerned with Petitioner's actions in retaining unlicensed plumbers, failing to obtain required permits and inspections, making misrepresentations to his customers, and overcharging them for his services. Petitioner was a party in both proceedings, and he acknowledges that he had a full and fair opportunity to be heard on the issues in the CPD adjudication. The only issue, then, is whether the CPD's Final Order constitutes a final judgment under the second prong of the analysis.

Petitioner contends that there was no "final judgment" as that phrase is ordinarily contemplated because the decision in the first proceeding was rendered by an administrative agency, not a court. In that regard, he places great weight on the fact that

18

the CPD's decision was called a "final *order*" instead of a "final *judgment*," and contends that this distinction is dispositive. The Board responds, and the Court of Special Appeals agreed, that Petitioner's arguments are based on mere semantics. *Id.* at 693. We are in accord with the Board and the Court of Special Appeals.[7]

The Supreme Court recently opined on the subject. *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293 (2015). In that case, the owner of trademark SEALTIGHT had opposed before the Trademark Trial and Appeal Board ("TTAB") another corporation's attempt to register the mark SEALTITE, and at the same time had sued that corporation in federal district court for trademark infringement. *Id.* at 1299. When the TTAB issued a decision that registration of SEALTITE would result in a likelihood of confusion—also an element of a trademark infringement claim—the owner of SEALTIGHT sought for that ruling to have preclusive effect in the infringement litigation. *Id.* at 1302. The district court rejected the request on the ground that the TTAB is not an Article III court, and a jury ultimately concluded that there was no likelihood of confusion. *Id.*

The Supreme Court reversed. It concluded that "this Court's cases and the Restatement make clear that issue preclusion is not limited to those situations in which the same issue is before two *courts*." *Id.* at 1303. The Court reasoned that one can presume

---

[7] Petitioner also argued before us that, because neither the CPD nor the Board is part of the judicial branch, the "*judicial* economy" factor articulated in *Parklane* cannot be satisfied here. We have already explained why the judicial, or quasi-judicial, economy consideration derived from *Parklane* was indeed satisfied, and we reject Petitioner's argument to the contrary.

that Congress, or, presumably, the General Assembly in this case, intended for administrative agency decisions to have preclusive effect precisely because the legislature delegated quasi-judicial functions to that agency. *Id.* (explaining that "a valid and final adjudicative determination by an administrative tribunal has the same effects under the rules of res judicata, subject to the same exceptions and qualifications, as a judgment of a court" (quoting Restatement (Second) of Judgments § 83(1))). Thus, the Court held that the district court should have granted preclusive effect to the TTAB's conclusion that a likelihood of confusion could result from registration of the SEALTITE mark. *See id.* at 1305 (citing *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 797 (1986)) (noting the *Elliott* Court's conclusion that, "absent a contrary indication, Congress presumptively intends that an agency's determination (there, a state agency) has preclusive effect"). The Court's reasoning applies with equal force here.

We have held that an agency decision can have preclusive effect when that agency is "performing quasi judicial functions." *See Batson v. Shiflett*, 325 Md. 684, 703 n.7 (1992). We will grant an agency decision preclusive effect for purposes of collateral estoppel upon satisfaction of the three-part test arising from *Exxon Corp. v. Fischer*, 807 F.2d 842, 845-46 (9th Cir. 1987), referred to as the *Exxon* test. *See Batson*, 325 Md. at 701. That test provides that an agency decision can have preclusive effect if: (1) the agency acted in a judicial capacity; (2) the issue presented to the fact finder in the second proceeding was fully litigated before the agency; and (3) resolution of the issue was necessary to the agency's decision. *Id.* When those elements are satisfied, "agency findings made in the course of proceedings that are judicial in nature should be given the

same preclusive effect as findings made by a court." *Id.* at 702; *accord United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966) ("When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose."). Each of those factors is unquestionably satisfied here.

First, the ALJ acted in a judicial capacity in the CPD proceeding. An administrative agency acts in a judicial capacity "[b]y conducting a hearing, allowing the parties to present evidence and ruling on a dispute of law." *Batson*, 325 Md. at 705 (internal quotation marks omitted); *see also Exxon Corp.*, 807 F.2d at 846 (noting that "Exxon was given a hearing, with a full opportunity to present its case and attempt to rebut opposing evidence"). The CPD adjudication took place over the course of two days, during which time the CPD submitted 84 exhibits and examined 24 witnesses. Petitioner, should he have chosen to do so, likewise had the opportunity to present his own evidence or call witnesses in his defense. The CPD then issued a final decision detailing its findings and conclusions with respect to Petitioner's many violations of the CPA.

Second, the issues to which the Board granted preclusive effect were actually litigated and determined in the CPD proceeding. *See Batson*, 325 Md. at 706 (noting that the second prong of the *Exxon* test is concerned with whether "the identical issue sought to be relitigated was actually determined in the earlier proceeding"). Petitioner has acknowledged that the issues in the two proceedings are identical, and, to be sure, both administrative proceedings were concerned with the same misconduct in Petitioner's

21

plumbing business.

Third, the CPD's finding that Petitioner engaged in misconduct in his plumbing business in violation of the CPA was a necessary predicate to the CPD's issuance of penalties and costs in its Final Order. *See* CL § 13-410(a) ("A merchant who engages in a violation of this title is subject to a fine of not more than $1,000 for each violation.").

Because all elements of the *Exxon* test are satisfied, we hold that the CPD's Final Order has preclusive effect. *See Batson*, 325 Md. at 701. An agency decision can have preclusive effect regardless of whether that decision is called a "final order" or a "final judgment." As a result, even if we agreed with Petitioner that the distinction between a "final order" and a "final judgment" was more than semantic, which we do not, it would be of no moment here.

Petitioner argues that we should not apply the *Exxon* test in the context of offensive non-mutual collateral estoppel because it would set a "dangerous legal precedent" and leave a "wide-ranging and chaotic legal impact" on future trial court and administrative proceedings. We disagree. As the Board emphasized in its brief, by considering the *Parklane* factors as a threshold question, we have "already established ample safeguards to ensure fairness in the offensive application of non-mutual collateral estoppel to an administrative agency final decision by another administrative agency or a court." We need not grant Petitioner any further safeguards.

Petitioner raises hypothetical concerns that an ALJ's findings of fact could later be granted preclusive effect in court when those findings were based upon hearsay, but we fail to see how those hypothetical concerns implicate application of collateral estoppel here.

We agree with the Court of Special Appeals that "[t]he mere fact that hearsay might have been allowed in both the CPD and the [Board] hearings is irrelevant, as he had the same procedural opportunities in both forums." *Garrity*, 221 Md. App. at 693. If such a case were to arise in the future, we expect that the trial court, or administrative agency acting in a quasi-judicial capacity, would recognize that the two proceedings presented different procedural opportunities, thereby reflecting one of the elements of unfairness delineated in *Parklane*. 439 U.S. at 331. Here, Petitioner was charged by and participated in a hearing with two administrative agencies that were governed by the same rules of procedure, bore the same burden of proof, and required the same facts to be established to support violations of their respective statutes. It is against this backdrop that we conclude that non-mutual collateral estoppel can be applied offensively in this case in a manner that is fair to the party against whom the doctrine is asserted. We need not and do not opine on whether offensive non-mutual collateral estoppel could be applied appropriately upon another set of facts involving different tribunals, and we leave that question to a court presented with such facts.

### III.

### *Double Jeopardy*

Petitioner argues that "it is undisputed that the State of Maryland has punished [him] twice for the same offense" in violation of the Double Jeopardy Clause of the Fifth Amendment, by fining him $707,900 for violating the CPA and $75,000 for violating the MPA. He argues that the Board's penalty constitutes a "subsequent and redundant civil punishment" that is cumulative of the penalty he already received from the CPD for the

23

same conduct. Petitioner's double jeopardy argument assumes mistakenly that the CPD's penalty put him in jeopardy in the first instance. *Gianiny v. State*, 320 Md. 337, 344 (1990) (noting that "it is essential to a plea of double jeopardy that the accused must have been put in jeopardy"). We disagree with the assumption that the civil penalty imposed under the CPA was "criminal punishment," thereby placing Petitioner in initial jeopardy, much less that the Board's subsequent civil penalty, for violating an entirely separate statutory scheme, was a second "criminal punishment" in violation of the Double Jeopardy Clause.

The United States Supreme Court has made clear that the Double Jeopardy Clause only protects "against the imposition of multiple *criminal* punishments for the same offense." *Hudson v. United States*, 522 U.S. 93, 99 (1997). The proper first question before us, then, is whether the penalty imposed by the CPD should be characterized as civil or criminal. *See Breed v. Jones*, 421 U.S. 519, 528 (1975) (explaining that "jeopardy describes the risk that is traditionally associated with a criminal prosecution"). The answer to that question lies in statutory construction. *Hudson*, 522 U.S. at 99. Under current Supreme Court precedent, we first must discern whether the language of the statute authorizing the penalty indicates "a preference for one label or the other." *Id.* (quoting *United States v. Ward*, 448 U.S. 242, 248 (1980)). Even if the General Assembly intended for the sanction to be civil, we must then decide "whether the statutory scheme was so punitive either in purpose or effect, as to transfor[m] what was clearly intended as a civil remedy into a criminal penalty." *Id.* (alteration in original) (citations and internal quotation marks omitted). Making the latter determination requires us to consider a number of factors, as outlined in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963). Those

24

factors include:

> [w]hether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned.

*Id.* (footnotes omitted). The Supreme Court has also instructed that "these factors must be considered in relation to the statute on its face," *id.* at 169, and that "*only the clearest proof* could suffice to establish the unconstitutionality" of sanctions imposed by the government, *Ward*, 448 U.S. at 249 (emphasis added). In weighing these factors, moreover, "no one factor should be considered controlling as they 'may often point in differing directions.'" *Hudson*, 522 U.S. at 101 (quoting *Kennedy*, 372 U.S. at 169)).

Petitioner asks us to apply instead the rationale espoused by an earlier Supreme Court case, *United States v. Halper*, 490 U.S. 435 (1989). The *Halper* Court had instructed that principles of double jeopardy prohibited any second "punishment," defined as a sanction that serves the traditional goals of punishment—retribution and deterrence. *Id.* at 448-50. The Court concluded that a civil sanction could be considered punishment if it was so "overwhelmingly disproportionate to the damages [the defendant] has caused," that the sanction could not "fairly be said *solely* to serve [the] remedial purpose" of compensating the government. *Id.* at 448-49 (emphasis added).

We decline Petitioner's invitation, however, because the Supreme Court in *Hudson* displaced the analysis applied in *Halper*. *Hudson*, 522 U.S. at 101. The *Hudson* Court noted that *Halper* "deviated from our traditional double jeopardy doctrine" by "bypass[ing]

25

the threshold question: whether the successive punishment at issue is a 'criminal' punishment." *Id.* The Court further opined that this "deviation from longstanding double jeopardy principles was ill considered" and "has proved unworkable." *Id.* at 101-02. The Court reasoned that "all civil penalties have some deterrent effect," and therefore requiring a civil sanction to be "'solely' remedial" would mean that "no civil penalties are beyond the scope of the Clause." *Id.* at 102. The *Hudson* Court therefore clarified that the preliminary question in any double jeopardy analysis must concern whether a sanction can be fairly regarded as criminal in the first instance.

In assessing that preliminary question, we turn to the statutory language of the CPA. *See Hudson*, 522 U.S. at 99 (noting that a double jeopardy inquiry begins with determining whether the language of the statute indicates "a preference for one label or the other" (quoting *Ward*, 448 U.S. at 248)). To begin, the statute according to which Petitioner was sanctioned expressly designated the penalty as civil; CL § 13-410 is entitled "Civil penalty — Merchants." That statute provides at subsection (a) that a person who violates the CPA "is subject to a fine of not more than $1,000 for each violation." Subsection (b) authorizes the CPD to sanction a merchant "who subsequently repeats the same violation" up to $5,000 for subsequent violations. In fashioning the appropriate penalty, the statute refers the CPD to certain factors to consider, such as the severity of the violation, the good faith of the merchant, whether the penalty will sufficiently deter future violations, and whether restitution and injunctive relief "is insufficient for the protection of consumers." *Id.* § 13-410(d). Nowhere in that statute is there any mention of any criminal disposition. And, notably, that provision includes the same factors that agencies should consider generally in

26

imposing a "civil penalty" under the Administrative Procedure Act. SG § 10-1001.

By contrast, CL § 13-411, entitled "Criminal penalties," sets forth criminal consequences for violating the CPA. Aside from a small subset of CPA violations not relevant here, CL § 13-411 provides that violations of the CPA constitute a misdemeanor, and "unless another criminal penalty is specifically provided elsewhere, on conviction [a merchant] is subject to a fine not exceeding $1,000 or imprisonment not exceeding one year or both, in addition to any civil penalties." Because criminal and civil penalties were separated into distinct statutes, and the language of each is clear, we conclude that the General Assembly intended for the statutory provision according to which Petitioner was sanctioned to constitute a civil penalty. *See Ward*, 448 U.S. at 249 (concluding that the legislature's intent was clear because the sanction was referred to as a "'civil penalty,' a label that takes on added significance given its juxtaposition with the criminal penalties set forth in the immediately preceding subparagraph"); *cf. Kansas v. Hendricks*, 521 U.S. 346, 361 (1997) (emphasizing that the statute authorizing commitment for sexually violent predators, described as a civil commitment proceeding, was located in the probate code rather than the criminal code, and concluding that "[n]othing on the face of the statute suggests that the legislature sought to create anything other than a civil commitment scheme designed to protect the public from harm").

Because the General Assembly intended for the penalty to be civil in nature, we turn now to the question of whether the penalty is nevertheless "so punitive in form and effect as to render [it] criminal." *Hudson*, 522 U.S. at 104 (quoting *United States v. Ursery*, 518 U.S. 267, 290 (1996)). We hold that "there is little evidence, much less the clearest proof

that we require," that the CPD's civil penalty was so punitive that it should be regarded as a criminal punishment. *See id.*

First, we emphasize that the CPD is charged with protecting consumers and ensuring that only merchants with integrity are offering goods and services to the public. *See* CL §§ 13-102, 13-201. The CPA contains a statutory statement of purpose, in which it recognizes that "there has been mounting concern over the increase of deceptive practices in connection with sales of merchandise, real property, and services." *Id.* § 13-201. It explains that the CPA is designed "to assist the public in obtaining relief from these practices, and to prevent these practices from occurring in Maryland . . . and thereby maintain the health and welfare of the citizens of the State." *Id.* The CPD, in turn, was created to effectuate that intent. *See id.* §§ 13-201, 13-204.

We have held that penalties imposed on licensed individuals for violating provisions attendant to that license are outside of the reach of the Double Jeopardy Clause because those penalties are directed toward protecting the public, and are therefore remedial, rather than punitive. *See Spencer*, 380 Md. at 534 ("The Board [of Pharmacy]'s enforcement of its licensing and disciplinary requirements serve purposes essential to the protection of the public, which are deemed remedial, rather than punitive, and therefore are not subject to double jeopardy principles."). In the context of a license suspension, we explained that the purpose of a licensing system "is to prevent unscrupulous or incompetent persons from engaging in the licensed activity" and to "protect the public" from those persons. *See State v. Jones*, 340 Md. 235, 251-52 (1995); *cf. Ward v. Dep't of Pub. Safety & Corr. Servs.*, 339 Md. 343, 350 (1995) (holding that a penalty for employee misconduct was not punishment

28

for double jeopardy purposes because the purpose of the penalty was to ensure that employees conform to the standard of conduct and was therefore remedial); *McDonnell v. Comm'n on Med. Discipline*, 301 Md. 426, 436 (1984) (explaining that the "purpose of disciplinary proceedings against licensed professionals is not to punish the offender but rather as a catharsis for the profession and a prophylactic for the public"). For that reason, we have concluded that "license suspensions generally serve remedial purposes." *Jones*, 340 Md. at 251. That rationale applies to penalties imposed for violating consumer protection laws, equally aimed at protecting the public, because a monetary penalty similarly has not "historically been viewed as punishment." *See Hudson*, 522 U.S. at 104 (noting that "the payment of fixed or variable sums of money is a sanction which has been recognized as enforcible [sic] by civil proceedings since the original revenue law of 1789" (alteration in original) (quoting *Helvering v. Mitchell*, 303 U.S. 391, 400 (1938))). A statutory scheme designed to protect consumers is necessarily remedial, notwithstanding that a penalty for violating those statutes may have a deterrent component to it. *Jones*, 340 Md. at 249 (concluding that a penalty should not be viewed from a defendant's perspective in determining whether the penalty constitutes punishment because "even remedial sanctions carry the sting of punishment" (quoting *Halper*, 490 U.S. at 447 n.7)). Because the CPA is a remedial statutory scheme, monetary penalties for its violations are civil, rather than criminal, and consequently do not implicate the Double Jeopardy Clause.

We reach the same conclusion by applying the *Kennedy* factors. A monetary penalty is not an "affirmative disability or restraint." *See Smith v. Doe,* 538 U.S. 84, 100 (2003) (concluding that the sex offender registry was not an affirmative disability or

restraint because it "imposes no physical restraint, and so does not resemble the punishment of imprisonment, which is the paradigmatic affirmative disability or restraint"). The penalty also is not imposed *only* upon a finding of scienter because the CPD can assess that penalty against "[a] merchant who engages in a violation of this title." *See* CL § 13-410(a); *accord Hudson*, 522 U.S. at 104 (noting that a penalty could be assessed "against any person 'who violates' any of the underlying banking statutes, without regard to the violator's state of mind"). That the penalty may, in addition to its ultimately remedial goal, promote some form of retribution and deter future violations does not in itself transform what is otherwise a civil sanction into a criminal punishment. *See Hudson*, 522 U.S. at 100-01 (rejecting the notion in *Halper* that promoting the traditional goals of punishment rendered a monetary penalty a criminal punishment because that impermissibly "elevated a single *Kennedy* factor").

In that regard, while Petitioner's misconduct could also have subjected him to a criminal prosecution under the CPA, that factor alone does not render the civil monetary penalty a criminal punishment. *See Hudson*, 522 U.S. at 101 (instructing that "no one factor should be considered controlling"); *Klein v. State*, 52 Md. App. 640, 645 (1982) (concluding that "[t]he remedies available in the Consumer Protection Act are civil and equitable"). "[T]he nature of the sanction cannot turn solely on whether the conduct at issue is also a crime" because the legislature "may impose both a criminal and a civil sanction in respect to the same act or omission." *SEC v. Palmisano*, 135 F.3d 860, 865-66 (2d Cir. 1998) (quoting *Ursery*, 518 U.S. at 292) (concluding that a disgorgement order for violating securities laws did not place the violator in jeopardy even though the conduct was

30

also criminal, the violations required scienter, and the penalty had a deterrence element because the securities laws have a clear remedial purpose). Petitioner has not alerted us to any "alternative purpose to which [the penalty] may rationally be connected," and in our view the purpose is to protect the public from dishonest merchants. *See Grossfeld v. Commodity Futures Trading Comm'n*, 137 F.3d 1300, 1303 (11th Cir. 1998) (per curiam) (concluding that a fine imposed for violating the Commodities Exchange Act was a civil and remedial penalty because it was rationally related to the remedial purpose of deterring fraudulent behavior by brokers).

Finally, the amount of the fine imposed on Petitioner did not transform the civil penalty into criminal punishment. The CPA authorizes the CPD to charge $1,000 for each violation of the Act, and thereafter to assess $5,000 for each repeated violation against a merchant who "subsequently repeats the same violation." CL § 13-410(a)-(b). Petitioner committed over 7,000 violations and engaged in a pattern of deceit against hundreds of Maryland homeowners over the course of several years. Mindful that we are required to look at the statute *on its face*, *Kennedy*, 372 U.S. at 169, a fine of $1,000 for each violation cannot reasonably be characterized as "excessive in relation to the purpose assigned," *see Grossfeld*, 137 F.3d at 1303-04 & n.7 (concluding that a treble damages sanction of $1.8 million remained a civil, remedial penalty because the statute on its face was not unreasonable). That Petitioner committed an extensive number of violations, and the summation of each violation resulted in a large monetary penalty, cannot be used in his favor to transform what is unquestionably a civil remedial sanction into a criminal punishment. Under the *Kennedy* factors, there is no basis to override the General

31

Assembly's intent to impose a civil, nonpunitive sanction, and certainly not the "clearest proof" that the Supreme Court requires. We therefore hold that the CPD's sanction did not constitute "criminal punishment" for purposes of the Double Jeopardy Clause.

Although unnecessary to the resolution of Petitioner's double jeopardy argument, we would conclude likewise that the subsequent civil penalty imposed by the Board was not "criminal punishment" for purposes of double jeopardy. Like the CPA, the MPA is a remedial scheme designed to protect the public. It contains both civil and criminal punishments that are clearly delineated, and the monetary penalty is reasonable on its face. Consequently, neither the CPD's nor the Board's penalties placed Petitioner in "jeopardy" for purposes of the Double Jeopardy Clause.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**

Circuit Court for Baltimore City
Case No. 24-C-13-004631
Argued: December 4, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 35

September Term, 2015

WAYNE GARRITY, SR.

v.

MARYLAND STATE BOARD OF
PLUMBING

Barbera, C.J.
*Battaglia
Greene
Adkins
McDonald
Watts
Harrell, Glenn T., Jr. (Retired,
    Specially Assigned),

JJ.

Concurring Opinion by Adkins, J.

Filed: April 26, 2016

* Battaglia, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the decision and adoption of the majority opinion.

Respectfully, I concur with the Majority. The Majority's Double Jeopardy Clause analysis of the CPA is eminently reasonable. In its robust discussion of Garrity's penalty under the CPA, however, the penalty Garrity incurred under the MPA fades into the background. But the Court should be troubled by the MPA penalty lest we sanction the imposition of duplicate fines for the same conduct. *Cf. Howard Cnty., Md. v. One 1994 Chevrolet Corvette Vin No. 1G1YY22P5R5100931*, 119 Md. App. 93, 98 (1998) (affirming the trial court's conclusion that the excessive fines clause prohibited a civil forfeiture).[1]

Excessive fines may not be imposed under Article 25 of the Maryland Declaration of Rights. Md. Const. art. 25; *see also* U.S. Const. amend. VIII. This prohibition "limits the government's power to extract payments . . . as punishment for some offense." *Wemhoff v. City of Balt.*, 591 F. Supp. 2d 804, 808 (D. Md. 2008) (quoting *United States v. Bajakajian*, 524 U.S. 321, 328 (1998)). Although usually applicable to criminal fines, this proscription reaches civil fines "designed at least in part to punish." *Id.* (citing *United States v. Austin*, 509 U.S. 602, 610 (1993)). When a civil fine comes within the ambit of this prohibition, our task is to "examine the proportionality between the fine and the gravity of the associated offense in order to determine whether it is constitutionally excessive." *Id.* This examination applies to questions of excessive fines under both the federal and our

---

[1] The Board sought to revoke Garrity's license based upon conduct alleged in the Charge Letter, such as incompetent plumbing services. Maj. Slip Op. at 4. This penalty is reasonable because the State has imposed a license requirement to ensure that "qualified individuals" carry out the purposes of Title 12 of the BOP: "protect the integrity of the potable water supply" and "provide for the efficient and safe discharge of storm drainage and sanitary drainage." BOP § 12-102. Garrity's misconduct jeopardizes these statutory goals such that he should no longer possess a license.

constitution. *Id.*; *see Howard Cnty.*, 119 Md. App. at 102 (explaining that the excessive fines clauses under Article 25 and the Eighth Amendment "'should be interpreted coextensively'") (quoting *Aravanis v. Somerset Cnty.*, 339 Md. 644, 656–57 (1995)).

When the General Assembly added the penalty provision to BOP § 12-312, the relevant bill articulated this provision as an "attempt[]" to "increase the fines to the point that they serve as an effective deterrent against undesirable behavior." H.B. 88, Fiscal Note, 2001 Reg. Sess., at 3 (Md. 2001). Deterrence is a "traditional aim[] of punishment." *Hudson v. United States*, 522 U.S. 93, 99 (1997). Although the Majority concludes that the penalty the Board imposed was "not 'criminal punishment' for purposes of double jeopardy," Maj. Slip Op. at 32, I conclude that the penalty provision under BOP § 12-312 falls within the scope of the excessive fines clause because the provision was "designed at least in part to punish," *Wemhoff*, 591 F. Supp. 2d at 808; *see also United States v. Mackby*, 261 F.3d 821, 830 (9th Cir. 2001) (considering legislative history in determining whether a statutory sanction was punitive).

While the excessive fines test focuses on the relationship between the fine and the associated offense, courts have undertaken this inquiry by also considering other penalties levied against the defendant. *Cf. United States v. Ferro*, 681 F.3d 1105, 1115 (9th Cir. 2012) ("In assessing whether a fine is excessive, this court is 'not required to consider any rigid set of factors.'") (citation omitted). In *Wemhoff*, for example, the U.S. District Court for the District of Maryland considered whether a late payment penalty for a parking fine was excessive in light of the original fine. 591 F. Supp. at 808–09; *see also Mackby*, 261

F.3d at 831 (observing that the excessive fines analyses of a civil penalty and treble damages "need not be considered in isolation as if the other did not exist").

In *State v. Starlight Club*, the Supreme Court of Utah affirmed the judgment of the revocation of an establishment's charter and a fine of $2,500 but reversed as to the fines of $5,000 for two additional convictions arising out of the same conduct. 406 P.2d 912, 914–15 (Utah 1965). The establishment's employee sold around a dozen alcoholic drinks to a couple in violation of a state statute. *Id.* at 914. Although the court acknowledged that each violation of the statute could trigger the provision imposing a $2,500 fine, the court explained that "the gathering of this evidence, in this particular case, was really one episode designed to terminate defendant's charter, . . . and that really but one mission, not three, was accomplished." *Id.* Moreover, the court reasoned that it was unjustifiable to seek "continued charges and convictions" just "to aggrandize the penalty" because a single purchase of alcohol alone triggered the penalties of forfeiture of charter and a $2,500 fine. *Id.* at 915.

Returning to BOP § 12-312, the General Assembly enacted the monetary penalty provision because various Maryland licensing boards believed they lacked the authority to deter unprofessional behavior. H.B. 88, Fiscal Note, 2001 Reg. Sess., at 3. For the Board to seek monetary penalties in addition to the revocation of Garrity's license ignores the fact that another State agency imposed a penalty based upon the same conduct and in part, too, as a deterrence. *Compare* Maj. Slip Op. at 5 (noting that the "Board's case [against Garrity] largely consisted of the CPD's findings and conclusions"), *with* CL § 13-410(d) ("Whether the amount of the penalty will achieve the desired deterrent purpose" is a mandatory

3

consideration for the CPD.).  Thus, while Garrity's misconduct sufficiently justified the Board's action of revoking his license, the Board's pursuit of monetary penalties strikes me, as in *Starlight Club*, as an unjustified attempt to increase the penalty Garrity incurred as a result of the CPD's case against him.  *See also* BOP § 12-312(a)(3) ("The Board shall pay any penalty collected under this subsection into the *General Fund of the State*.") (emphasis added).

Garrity did not make a claim under the excessive fines clause.  Thus, the Majority rightly limited its discussion regarding the duplicate fine to the double jeopardy claim made by Garrity, and I agree with that discussion, and join that opinion.  But I write this concurring opinion lest the Majority opinion be construed as necessarily rejecting a challenge under the excessive fines clause to double fines for the same conduct.  In another case, where such claim is preserved, the excessive fines clause could provide the foundation for curbing governmental enthusiasm for fines.

4